ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
G. MARK ALBRIGHT, ESQUIRE
Nevada State Bar No. 001394
801 South Rancho Dr., Suite D-4
Las Vegas, NV 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| GERALDINE LONGBINE, Derivatively On Behalf of BALLY TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT L. MIODUNSKI, ROBERT L. SAXTON, STEVEN DES CHAMPS, MARK LERNER, DAVID ROBBINS, ANTHONY DICESARE, JOEL KIRSCHBAUM, KEVIN VERNER, RICHARD HADDRILL, STEPHEN M. RACE, AND JACQUES ANDRÉ <br><br> Defendants, <br><br> and <br><br> BALLY TECHNOLOGIES, INC., a Nevada corporation, <br><br> Nominal Defendant. | Civil Action No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002** <br><br> **JURY TRIAL DEMANDED** <br><br> **ECF CASE** |

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Bally Technologies, Inc. (formerly known as Alliance Gaming Corporation, "Alliance Gaming" or the "Company"), a Nevada Corporation, on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002. These violations occurred between July 2002 and

1 the present (the "Relevant Period") and have caused substantial losses to Alliance Gaming as well
2 as other damages, including, but not limited to significant harm to its reputation and goodwill.

3 **JURISDICTION AND VENUE**

4     2.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.
5 §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the
6 amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer
7 jurisdiction on a court of the United States that it would not otherwise have.

8     3.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331
9 because plaintiff's claims arise, in part, out of the Constitution and the laws of the United States,
10 including the Sarbanes-Oxley Act of 2002.  This Court has supplemental jurisdiction under 28
11 U.S.C. §1367(a) over all other claims because they are so related to claims in this action within
12 such original jurisdiction that they form part of the same controversy under Article III of the
13 United States Constitution.

14     4.    This Court has jurisdiction over each defendant named herein because each
15 defendant is either a corporation that conducts business in and maintains operations in this District,
16 or is an individual who has sufficient minimum contacts with Nevada so as to render the exercise
17 of jurisdiction by the Nevada courts permissible under traditional notions of fair play and
18 substantial justice.

19     5.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because (a) one or
20 more of the defendants either resides in or maintains executive offices in this District; (b) a
21 substantial portion of the transactions and wrongs complained of herein, including the defendants'
22 primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in
23 violation of fiduciary duties owed to Alliance Gaming occurred in this District; and (c) defendants
24 have received substantial compensation in this District by doing business here and engaging in
25 numerous activities that had an effect in this District.

26 **SUMMARY OF THE ACTION**

27     6.    Alliance Gaming is a diversified, worldwide gaming company that designs,
28 manufactures, operates and distributes slot and video machines to the global gaming industry.  The

1 Company also designs, integrates and sells highly specialized computerized monitoring systems
2 that provide casinos with networked accounting and security services for their gaming machines
3 with over 276,000 game monitoring units installed worldwide.  The Company is based in Las
4 Vegas and conducts its machine and systems operations under the name Bally Gaming and
5 Systems.  Alliance Gaming also owns and operates a dockside casino in Vicksburg, Mississippi
6 which has approximately 12 table games and 890 gaming devices.

7        7.      On March 13, 2006, Alliance Gaming announced that its common stock would
8 begin trading on the New York Stock Exchange ("NYSE") as Bally Technologies, Inc.

9        8.      During the Relevant Period, defendants caused or allowed Alliance Gaming's shares
10 to trade at artificially inflated levels through the issuance of false and misleading statements and
11 quarterly reports with the Securities and Exchange Commission ("SEC").  These statements were
12 materially false and misleading because they failed to disclose and misrepresented the following
13 adverse facts, among others, that: (i) the Company was experiencing massive problems/delays
14 associated with its Wide Area Progressive ("WAP") games in Nevada due to regulatory hold-ups;
15 (ii) the Company was experiencing massive delays in its approval and deployment of New York
16 VLT game revisions; (iii) the Company's margins were being slashed by increased costs associated
17 with the Company's central and traditional determination products; (iv) the Company's acquisition
18 of Sierra Design Group ("Sierra") was suffering from massive integrative problems; moreover,
19 Sierra's strength in the New York video lottery business had faded causing the defendants to
20 question whether Alliance Gaming had, in fact, overpaid for Sierra; (v) the Company was losing its
21 competitive position and was experiencing problems in the Company's game unit (video product);
22 and (vi) the Company was using improper revenue recognition policies and improper tax rates.  As
23 a result, the Company's shares traded at inflated prices topping $34 during the Relevant Period.

24        9.      Throughout the Relevant Period, the defendants caused or allowed the Company to
25 issue numerous false and misleading press releases which portrayed an image of strong and
26 continuously improving financial health.  As a result, the Company's earnings forecasts of $1.04
27 per share for FY:04 and $1.40 per share for FY:05, were grossly inflated.  Furthermore, the
28 previously reported earnings for FY:03 and FY:04 and for the nine month period that ended on

1    March 31, 2005, were adjusted downward when the defendants caused or allowed the Company to
2    restate its earnings in November 2005.  The restatement of FY:03 and FY:04 earnings was due to
3    specific material weaknesses in the following areas: (i) inadequate staffing and training in finance
4    and accounting; (ii) ineffective controls related to the preparation of certain account analysis,
5    account summaries and account reconciliations; (iii) inadequate controls related to revenue
6    recognition; (iv) inadequate controls related to inventory valuation; (v) ineffective controls related
7    to income taxes; and (vi) ineffective controls at the entity level.

8         10.     Also during the Relevant Period, defendants caused or allowed Alliance Gaming to
9    delay the release of its Form10-K filing with the SEC for FY:05, causing the company to be in
10   default under a loan agreement with a creditor, subjecting the Company to default interest
11   penalties.  Further, the defendants caused or allowed the Company to delay filing its 1Q:06 and
12   2Q:06 Form 10-Q.  To date, these Form 10-Qs have not been filed.

13        11.     The Company is currently under formal investigation by the Securities and
14   Exchange Commission ("SEC").

15        12.     As a result of the delayed filings, restatements and SEC investigation, shares of
16   Alliance Gaming have plunged from a high of $34.16 to a low of $9.00.  Thus, the Company's
17   market capitalization has been damaged by over $1.3 billion.  At the same time the Company was
18   being harmed by defendants' misconduct, the defendants themselves benefited by selling over $44
19   million worth of their personally held Alliance Gaming shares at artificially inflated prices.

20                             **THE PARTIES**

21        13.     Plaintiff, Geraldine Longbine, is, and was at all times relevant hereto, an owner and
22   holder of Alliance Gaming common stock.  Plaintiff Longbine is a citizen of Florida.

23        14.     Nominal Defendant, Alliance Gaming is a corporation organized and existing under
24   the laws of the state of Nevada with its headquarters located at 6601 South Bermuda Road, Las
25   Vegas, Nevada, 89119.

26        15.     Defendant Robert L. Miodunski ("Miodunski") is, and was at all times relevant
27   hereto, an insider of Alliance Gaming with significant influence and control over its business.
28   During the Relevant Period, Miodunski was President, Chief Executive Officer ("CEO") and a

1   director of the Company until September 2004.   On June 30, 2004, Miodunski entered into a

2   Separation and Consulting Agreement ("Separation Agreement") with the Company whereby he

3   resigned his positions as CEO, President and director effective September 30, 2004. However, the

4   Individual defendants caused or allowed Alliance Gaming, to execute an agreement retaining

5   Miodunski as an independent consultant to the Board of Directors (the "Board") through December

6   31, 2008.   Pursuant to the Separation Agreement, the Company agreed to pay Miodunski a

7   "special" bonus of $1,000,000 for the divesture of United Coin Machine, Co. The Agreement also

8   provided that Miodunski would be eligible for another bonus at the end of FY:05 (June 30, 2005)

9   and would be paid $250,000 annually for services as a consultant to the Board through 2008.

10  Furthermore, all of Miodunski's issued and outstanding stock options continued to vest and be

11  exercisable as if Miodunski had retained his employment. The Separation Agreement remains in

12  full force and effect. Miodunski is a citizen of Nevada.

13          (a)     Because of Miodunski's positions, he knew the adverse non-public

14  information about the business of Alliance Gaming, as well as its finances, markets and present

15  and future business prospects, via access to internal corporate documents; conversations and

16  connections with other corporate officers and employees; attendance at management and Board

17  meetings and committees thereof and via reports and other information provided to him in

18  connection therewith.

19          (b)     During the Relevant Period, Miodunski participated in the issuance of false

20  and/or misleading statements, including the preparation of the false and/or misleading press

21  releases and SEC filings and signed certifications pursuant to §302 of the Sarbanes-Oxley Act of

22  2002 and signed Alliance Gaming's Form 10-Ks pursuant to the requirements of the Securities

23  Exchange Act of 1934.

24          (c)     During the Relevant Period, Miodunski sold 372,332 shares of Alliance

25  Gaming stock for proceeds of $7,177,134.06.

26          (d)     Alliance Gaming granted Miodunski 100,000 options to purchase Alliance

27  Gaming stock and paid him $950,221, in salary, bonus and other compensation for FY:04 and

28  $1,034,290 in salary, bonus and other compensation for FY:05. The FY:05 payments included

1   $5,769 in contributions made by the Company to the Company's 401(k) Plan, and $28,521 for
2   accrued vacation.

3       16.   Defendant Richard Haddrill ("Haddrill") is, and at all times relevant hereto was, a
4   director of Alliance Gaming since April 2003. Haddrill also served as a member of the Audit and
5   Compensation Committees until October 27, 2004. Since October 1, 2004, Haddrill has served as
6   the Company's President and CEO. Haddrill is a citizen of Nevada.

7           (a)   Because of Hadrill's positions, he knew the adverse non-public information
8   about the business of Alliance Gaming, as well as its finances, markets and present and future
9   business prospects, via access to internal corporate documents, conversations and connections with
10  other corporate officers and employees, attendance at Board meetings and various committees
11  thereof and via reports and other information provided to him in connection therewith.

12          (b)   During the Relevant Period, Haddrill participated in the issuance of false
13  and/or misleading statements, including the preparation of the false and/or misleading press
14  releases and SEC filings and signed certifications pursuant to §302 of the Sarbanes-Oxley Act of
15  2002 and signed Alliance Gaming's Form 10-Ks pursuant to the requirements of the Securities
16  Exchange Act of 1934.

17          (c)   As a non-employee director, in FY:04, Haddrill received $50,000 for his
18  service on the Board and $10,000 for his service as a member of the Audit and Compensation
19  Committees. Further, Haddrill received an option grant of 30,000 shares of Company stock on the
20  date of each Annual Meeting at an exercise price equal to fair market value on the grant date.
21  These options vested immediately and have a ten year term. In January 2004, Haddrill received an
22  option grant of 195,000 shares, consisting of four branches with a seven year term and a number of
23  performance criteria. Effective June 13, 2005, the Board approved a resolution accelerating the
24  vesting and exerciseability of all outstanding, unvested options and eliminating any performance-
25  based vesting criteria with regard to those options.

26          (d)   As CEO, Haddrill is not entitled to receive any compensation as a director of
27  the Company. During the term of his employment agreement Haddrill receives an annual salary of
28  $980,000. Pursuant to the Company's 2001 Long Term Incentive Plan, he also received (i)

1  500,000 non-statutory stock options to purchase shares of Company common stock exercisable at

2  $17.16 per share beginning on October 1, 2012, through October 1, 2014, with some options

3  exercisable at an earlier date; and (ii) 377,030 Restricted Stock Units valued at $6.5 million which

4  vest in three equal installments on October 1, 2005, October 1, 2006 and October 1, 2007, subject

5  to Haddrill's continued employment.  He also receives payment of a country club initiation fee of

6  his choosing, as well as relocation expenses.

7        (e)    Alliance Gaming paid defendant Haddrill $1,044,047, in salary, and other

8  compensation along with 430,000 options to purchase Alliance Gaming stock for FY:05.

9        17.    Defendant Robert L. Saxton ("Saxton") is, and at all times relevant hereto was, the

10  Treasurer of Alliance Gaming.  As of January 2004, he was also the Company's Chief Financial

11  Officer ("CFO") and Executive Vice President.  In March 2005, Mr. Saxton was appointed

12  Executive Vice President of Gaming and was replaced as CFO by defendant Stephen Des Champs.

13  Saxton is a citizen of Nevada.

14        (a)    Because of Saxton's positions, he knew the adverse non-public information

15  about the business of Alliance Gaming, as well as its finances, markets and present and future

16  business prospects, via access to internal corporate documents, conversations and connections with

17  other corporate officers and employees, attendance at management meetings and via reports and

18  other information provided to him in connection therewith.

19        (b)    During the Relevant Period, Saxton participated in the issuance of false

20  and/or misleading statements, including the preparation of the false and/or misleading press

21  releases and SEC filings and signed certifications pursuant to §302 of the Sarbanes-Oxley Act of

22  2002 and signed Alliance Gaming's Form 10-Ks pursuant to the requirements of the Securities

23  Exchange Act of 1934.

24        (c)    During the Relevant Period, Saxton sold 307,305 shares of Alliance Gaming

25  stock for proceeds of $5,592,450.80.

26        (d)    Alliance Gaming paid defendant Saxton $642,875, in salary, bonus and

27  other compensation for FY:04 and $379,108, in salary, bonus and other compensation for FY:05,

28  and granted him 50,000 options to purchase Alliance Gaming stock each year.

18.     Defendant Steven Des Champs ("Des Champs"), is, and at all times relevant hereto was, Senior Vice President of Alliance Gaming.  During the Relevant Period, Des Champs was Alliance Gaming's Chief Accounting Officer until March, 2005 when he was appointed CFO.  On March 13, 2006, it was announced that he will be replaced as CFO in April 2006.  Des Champs is a citizen of Nevada.

(a)     Because of Des Champs' positions, he knew the adverse non-public information about the business of Alliance Gaming, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

(b)     During the Relevant Period, Des Champs participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings and signed Alliance Gaming's certifications pursuant to §302 of the Sarbanes-Oxley Act of 2002.

(c)     Alliance Gaming paid defendant Des Champs $359,304, in salary, bonus and other compensation along with 25,000 options to purchase Alliance Gaming stock for FY:04 and $267,634, in salary, bonus and other compensation along with 100,000 stock purchase options for FY:05.

(d)     During the Relevant Period, Des Champs sold 37,761 shares of Alliance Gaming stock for proceeds of $876,672.70.

19.     Defendant Mark Lerner ("Lerner") is, and at all times relevant hereto was, Senior Vice President, General Counsel and Secretary of Alliance Gaming.  Defendant Lerner is a citizen of Nevada.

(a)     Because of Lerner's positions, he knew the adverse non-public information about the business of Alliance Gaming, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

1         (b)      During the Relevant Period, Lerner participated in the issuance of false
2  and/or misleading statements, including the preparation of the false and/or misleading press
3  releases and SEC filings.

4         (c)      Alliance Gaming paid defendant Lerner $332,615, in salary, bonus and other
5  compensation along with 25,000 options to purchase Alliance Gaming stock for FY:04 and
6  $264,106, in salary, bonus and other compensation along with 25,000 stock purchase options for
7  FY:05.

8         (d)      During the Relevant Period, Lerner sold 64,565 shares of Alliance Gaming
9  stock for proceeds of $1,331,521.76.

10      20.     Defendant David Robbins ("Robbins") is, and at all times relevant hereto was,
11  Chairman of the Board and a director of the Company.  Robbins has also served continuously as
12  Chairman of the Audit Committee, and as a member of the Nominating and Corporate Governance
13  Committee, the Compensation Committee and the Office of the Chairman.  Robbins is a citizen of
14  New York.

15         (a)      Because of Robbins' positions, he knew the adverse non-public information
16  about the business of Alliance Gaming, as well as its finances, markets and present and future
17  business prospects, via access to internal corporate documents, conversations and connections with
18  other corporate officers and employees, attendance at Board meetings and various committees
19  thereof and via reports and other information provided to him in connection therewith.

20         (b)      During the Relevant Period, Robbins participated in the issuance of false
21  and/or misleading statements, including the preparation of the false and/or misleading press
22  releases and SEC filings and signed Alliance Gaming's Form 10-Ks pursuant to the requirements
23  of the Securities Exchange Act of 1934.

24         (c)      During the Relevant Period, Robbins sold 250,000 shares of Alliance
25  Gaming stock for proceeds of $4,531,770.00.

26         (d)      Pursuant to his employment agreement dated July 1, 2004, Robbins receives
27  $235,000 annually for his services as Chairman of the Board and $90,000 per year for his services
28  as a member of the Office of the Chairman.  Robbins is also entitled to an option grant of 30,000

1   shares on the date of each Annual Meeting at an exercise price equal to fair market value on the

2   grant date. This option grant vests immediately and has a ten-year term. In January 2004, Robbins

3   received an option grant of 195,000 shares, consisting of four tranches with a seven year term and

4   a number of performance criteria. Effective June 13, 2005, the Board approved a resolution

5   accelerating the vesting and exercise ability of all outstanding, unvested options and eliminating

6   any performance-based vesting criteria with regard to those options. On June 30, 2004, Robbins

7   was granted 39,000 stock options to purchase shares with an exercise price of $17.16 with an

8   exercise period of ten years. On June 13, 2005, Robbins was granted 35,000 stock options to

9   purchase shares with an exercise price of $14.77 per share.

10       21.    Defendant Anthony DiCesare ("DiCesare") is, and at all times relevant hereto was,

11   a director of Alliance Gaming. DiCesare was also Executive Vice-President of Development of

12   the Company from July 1, 1997 through June 30, 2004. DiCesare served as a member of the

13   Nominating and Corporate Governance Committee until October 27, 2004. DiCesare is a citizen

14   of New Jersey.

15       (a)    Because of DiCesare's positions, he knew the adverse non-public

16   information about the business of Alliance Gaming, as well as its finances, markets and present

17   and future business prospects, via access to internal corporate documents, conversations and

18   connections with other corporate officers and employees, attendance at Board meetings and

19   committees thereof and via reports and other information provided to him in connection therewith.

20       (b)    During the Relevant Period, DiCesare participated in the issuance of false

21   and/or misleading statements, including the preparation of the false and/or misleading press

22   releases and SEC filings and signed Alliance Gaming's Form 10-Ks pursuant to the requirements

23   of the Securities Exchange Act of 1934.

24       (c)    During the Relevant Period, DiCesare sold 729,746 shares of Alliance

25   Gaming stock for proceeds of $14,073,891.42.

26       (d)    Alliance Gaming paid defendant DiCesare a base salary of $186,539 and

27   performance bonus of $1,772,500 for FY:04. In January 2004, DiCesare also received an option

28   grant of 195,000 shares, consisting of four tranches with a seven year term and a number of

1   performance criteria.   Effective June 13, 2005, the Board approved a resolution accelerating the

2   vesting and exerciseability of all outstanding, unvested options and eliminating any performance-

3   based vesting criteria with regard to those options. On June 13, 2005 DiCesare was granted 35,000

4   stock options to purchase shares with an exercise price of $14.77 per share.

5       22.   Defendant Joel Kirschbaum ("Kirschbaum") is, and at all times relevant hereto was,

6   a director of Alliance Gaming.  Starting July 1, 2004, Kirschbaum entered into an agreement with

7   Alliance Gaming to serve as a member of the Office of the Chairman through December 31, 2007.

8   Kirschbaum served as Chairman of the Nominating and Corporate Governance Committee and as

9   a member of the Compensation Committee until October 27, 2004.  Kirschbaum is a citizen of

10   New York.

11       (a)   Because of Kirschbaum's positions, he knew the adverse non-public

12   information about the business of Alliance Gaming, as well as its finances, markets and present

13   and future business prospects, via access to internal corporate documents, conversations and

14   connections with other corporate officers and employees, attendance at Board meetings and

15   various committees thereof and via reports and other information provided to him in connection

16   therewith.

17       (b)   During the Relevant Period, Kirschbaum participated in the issuance of false

18   and/or misleading statements, including the preparation of the false and/or misleading press

19   releases and SEC filings and signed Alliance Gaming's Form 10-Ks pursuant to the requirements

20   of the Securities Exchange Act of 1934.

21       (c)   During the Relevant Period, Kirschbaum sold 500,000 shares of Alliance

22   Gaming stock for proceeds of $10,175,000.00.

23       (d)   Under his employment agreement which expired June 30, 2004, Alliance

24   Gaming paid Kirschbaum a base salary of $186,539 and performance bonus of $1,772,500 in

25   FY:04. Pursuant to his Agreement with the Company effective July 1, 2004, Kirschbaum received

26   an option grant of 39,000 shares and is now paid $100,000 per year as a member of the Office of

27   the Chairman.    In January 2004, Kirschbaum received an option grant of 195,000 shares,

28   consisting of four tranches with a seven year term and a number of performance criteria.  Effective

1    June 13, 2005, the Board approved a resolution accelerating the vesting and exerciseability of all

2    outstanding, unvested options and eliminating any performance-based vesting criteria with regard

3    to those options. On June 13, 2005 Kirschbaum was granted 35,000 stock options to purchase

4    shares with an exercise price of $14.77 per share.

5        23.     The Defendant Kevin Verner ("Verner") is, and at all times relevant hereto was, a

6    director of Alliance Gaming. Verner has also served continuously as Chairman of the

7    Compensation Committee and as a member of the Audit Committee. As of October 27, 2004,

8    Verner also serves on the Nominating and Corporate Governance Committee. Verner is a citizen

9    of South Carolina.

10        (a)     Because of Verner's positions, he knew the adverse non-public information

11    about the business of Alliance Gaming, as well as its finances, markets and present and future

12    business prospects, via access to internal corporate documents, conversations and connections with

13    other corporate officers and employees, attendance at Board meetings and various committees

14    thereof and via reports and other information provided to him in connection therewith.

15        (b)     During the Relevant Period, Verner participated in the issuance of false

16    and/or misleading statements, including the preparation of the false and/or misleading press

17    releases and SEC filings and signed Alliance Gaming's Form 10-Ks pursuant to the requirements

18    of the Securities Exchange Act of 1934.

19        (c)     As a non-employee director, Verner receives $50,000 annually for his

20    service on the Board, $10,000 per year for his service as a member of the Audit and Nominating

21    and Corporate Governance Committees, and an additional $10,000 for serving as Chairman of the

22    Compensation Committee. Verner also receives an option grant of 30,000 shares of Company

23    stock on the date of each Annual Meeting at an exercise price equal to fair market value on the

24    grant date. These options vest immediately and have a ten year term. In January 2004, Verner

25    received an option grant of 195,000 shares, consisting of four tranches with a seven year term and

26    a number of performance criteria. Effective June 13, 2005, the Board approved a resolution

27    accelerating the vesting and exerciseability of all outstanding, unvested options and eliminating

28    any performance-based vesting criteria with regard to those options. On June 30, 2004, Verner

1   received a special bonus of $25,000.  On June 13, 2005 Verner was granted 35,000 stock options
2   to purchase shares with an exercise price of $14.77 per share.

3        24.     Defendant Jacques André ("André") is, and at all times relevant hereto was, a
4   director of Alliance Gaming and a member of the Audit and Compensation Committees.  He is
5   also the chair of the Nominating and Corporate Governance Committee.  André is a citizen of New
6   Jersey.

7            (a)     Because of André's positions, he knew the adverse non-public information
8   about the business of Alliance Gaming, as well as its finances, markets and present and future
9   business prospects, via access to internal corporate documents, conversations and connections with
10  other corporate officers and employees, attendance at Board meetings and various committees
11  thereof and via reports and other information provided to him in connection therewith.

12           (b)     During the Relevant Period, André participated in the issuance of false
13  and/or misleading statements, including the preparation of the false and/or misleading press
14  releases and SEC filings and signed Alliance Gaming's Form 10-Ks pursuant to the requirements
15  of the Securities Exchange Act of 1934.

16           (c)     During the Relevant Period, André sold 34,288 shares of Alliance Gaming
17  stock for proceeds of $659,448.64.

18           (d)     As a non-employee director, André receives $50,000 annually as
19  compensation for his service on the Board, $10,000 for his services as a member of the Audit and
20  Compensation Committees and an additional $10,000 for his service as chair of the Nominating
21  and Corporate Governance Committee.  André also receives an option grant of 30,000 shares of
22  Company stock on the date of each Annual Meeting at an exercise price equal to fair market value
23  on the grant date.  These options vest immediately and have a ten year term.  In January 2004,
24  André received an option grant of 195,000 shares, consisting of four tranches with a seven year
25  term and a number of performance criteria.  Effective June 13, 2005, the Board approved a
26  resolution accelerating the vesting and exerciseability of all outstanding, unvested options and
27  eliminating any performance-based vesting criteria with regard to those options.  On June 30,
28

1   2004, André received a special bonus of $25,000.  On June 13, 2005, André was granted 35,000
2   stock options to purchase shares with an exercise price of $14.77 per share.

3       25.     Defendant Stephen M. Race ("Race") was appointed as a director of Alliance
4   Gaming in June 2005, and remains in that position.  Race is also a member of the Audit
5   Committee.  Race is a citizen of California.

6           (a)     Because of Race's positions, he knew the adverse non-public information
7   about the business of Alliance Gaming, as well as its finances, markets and present and future
8   business prospects, via access to internal corporate documents, conversations and connections with
9   other corporate officers and employees, attendance at Board meetings and various committees
10  thereof and via reports and other information provided to him in connection therewith.

11          (b)     During the Relevant Period, Race participated in the issuance of false and/or
12  misleading statements, including the preparation of the false and/or misleading press releases and
13  SEC filings and signed Alliance Gaming's certifications pursuant to §302 of the Sarbanes-Oxley
14  Act of 2002.

15          (c)     As a non-employee director, Race received an option grant of 50,000 shares
16  of common stock upon his appointment to the Board as well as $50,000 in compensation for his
17  service on the Board and $5,000 for his services as a member of the Audit Committee.

18      26.     The defendants identified in ¶¶14-15, 19-24 are referred to herein as the "Director
19  Defendants."   The defendants identified in ¶¶14-18 are referred to herein as the "Officer
20  Defendants."  The defendants identified in ¶¶14, 16-21, 23 are referred to herein as the "Insider
21  Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider
22  Selling Defendants are referred to herein as the "Individual Defendants."

23                      **DUTIES OF THE INDIVIDUAL DEFENDANTS**

24      27.     By reason of their positions as officers, directors and/or fiduciaries of Alliance
25  Gaming and because of their ability to control the business and corporate affairs of Alliance
26  Gaming, the Individual Defendants owed Alliance Gaming and its shareholders fiduciary
27  obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost
28  ability to control and manage Alliance Gaming in a fair, just, honest and equitable manner.  The

1   Individual Defendants were and are required to act in furtherance of the best interests of Alliance
2   Gaming and its shareholders so as to benefit all shareholders equally and not in furtherance of their
3   personal interest or benefit.

4        28.   Each director and officer of the Company owes to Alliance Gaming and its
5   shareholders the fiduciary duty to exercise good faith and diligence in the administration of the
6   affairs of the Company and in the use and preservation of its property and assets, and the highest
7   obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the
8   Individual Defendants had a duty to promptly disseminate accurate and truthful information with
9   regard to the Company's revenue, margins, operations, performance, management, projections and
10  forecasts so that the market price of the Company's stock would be based on truthful and accurate
11  information.

12       29.   The Individual Defendants, because of their positions of control and authority as
13  directors and/or officers of Alliance Gaming, were able to and did, directly and/or indirectly,
14  exercise control over the wrongful acts complained of herein, as well as the contents of the various
15  public statements issued by the Company. Because of their advisory, executive, managerial and
16  directorial positions with Alliance Gaming, each of the Individual Defendants had access to
17  adverse non-public information about the financial condition, operations, and improper
18  representations of Alliance Gaming.

19       30.   At all times relevant hereto, each of the Individual Defendants was the agent of
20  each of the other Individual Defendants and of Alliance Gaming, and was at all times acting within
21  the course and scope of such agency.

22       31.   To discharge their duties, the officers and directors of Alliance Gaming were
23  required to exercise reasonable and prudent supervision over the management, policies, practices
24  and controls of the financial affairs of the Company. By virtue of such duties, the officers and
25  directors of Alliance Gaming were required to, among other things:

26           (a)   refrain from acting upon material inside corporate information to benefit
27  themselves including refraining from selling shares while in possession of material, non-public
28  information;

1                (b)     ensure that the Company complied with its legal obligations and

2 requirements, including acting only within the scope of its legal authority and disseminating

3 truthful and accurate statements to the SEC and the investing public;

4                (c)     conduct the affairs of the Company in an efficient, business like manner so

5 as to make it possible to provide the highest quality performance of its business, to avoid wasting

6 the Company's assets, and to maximize the value of the Company's stock;

7                (d)     properly and accurately guide investors and analysts as to the true financial

8 condition of the Company at any given time, including making accurate statements about the

9 Company's financial results and prospects, and ensuring that the Company maintained an adequate

10 system of financial controls such that the Company's financial reporting would be true and accurate

11 at all times;

12                (e)     remain informed as to how Alliance Gaming conducted its operations, and,

13 upon receipt of notice or information of imprudent or unsound conditions or practices, to make

14 reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

15 and make such disclosures as necessary to comply with federal and state securities laws; and

16                (f)     ensure that the Company was operated in a diligent, honest and prudent

17 manner in compliance with all applicable federal, state and local laws, rules and regulations.

18         32.     Each Individual Defendant, by virtue of his position as a director and/or officer,

19 owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

20 exercise of due care and diligence in the management and administration of the affairs of the

21 Company, as well as in the use and preservation of its property and assets. The conduct of the

22 Individual Defendants complained of herein involves a knowing and culpable violation of their

23 obligations as directors and officers of Alliance Gaming, the absence of good faith on their part,

24 and a reckless disregard for their duties to the Company and its shareholders that the Individual

25 Defendants were aware or should have been aware posed a risk of serious injury to the Company.

26 The conduct of the Individual Defendants who were also officers and/or directors of the Company

27 during the Relevant Period have been ratified by the remaining Individual Defendants who

28 collectively comprised all of the Board during the Relevant Period.

33.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws, as well as a formal SEC investigation. As a result, Alliance Gaming has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)     the cost to obtain additional funds through borrowing which is now higher because Alliance Gaming's stock price has declined;

(c)     additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums;

(d)     costs incurred in complying with the SEC's formal investigation;

(e)     costs incurred from directing manpower to correct Alliance Gaming's defective internal controls and to restate its earnings for FY:03 and FY:04; and

(f)     costs incurred in investigating and defending Alliance Gaming and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

34.     Moreover, these actions have irreparably damaged Alliance Gaming's corporate image and goodwill. For at least the foreseeable future, Alliance Gaming will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Alliance Gaming's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

1   and conspired with one another in furtherance of their common plan or design. In addition to the
2   wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants
3   further aided and abetted and/or assisted each other in breach of their respective duties.

4       36.     During all times relevant hereto, the Individual Defendants collectively and
5   individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the
6   Company was improperly misrepresenting its financial results, in order to allow defendants to
7   artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants'
8   executive and directorial positions at Alliance Gaming and the profits, power and prestige that the
9   Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public,
10  including shareholders of Alliance Gaming, regarding the Individual Defendants' management of
11  Alliance Gaming's operations, the Company's financial health and stability, and future business
12  prospects, specifically related to the Company's financials that had been misrepresented by
13  defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of
14  conduct, the Individual Defendants collectively and individually took the actions set forth herein.

15      37.     The Individual Defendants engaged in a conspiracy, common enterprise and/or
16  common course of conduct commencing by at least July 2002 and continuing thereafter. During
17  this time the Individual Defendants caused or allowed the Company to conceal the true fact that
18  Alliance Gaming was misrepresenting its financial results. In addition, defendants also made other
19  specific, false statements about Alliance Gaming's financial performance and future business
20  prospects, as alleged herein.

21      38.     The purpose and effect of the Individual Defendants' conspiracy, common
22  enterprise, and/or common course of conduct was, among other things, to disguise the Individual
23  Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement,
24  waste of corporate assets and unjust enrichment; to conceal adverse information concerning the
25  Company's operations, financial condition and future business prospects; and to artificially inflate
26  the price of Alliance Gaming common stock so they could: (i) dispose of over $44 million of their
27  personally held stock; (ii) protect and enhance their executive and directorial positions and the
28

1  substantial compensation and prestige they obtained as a result thereof; and (iii) use the artificially
2  inflated Company stock to acquire companies in stock-for-stock transactions.

3      39.    The Individual Defendants accomplished their conspiracy, common enterprise
4  and/or common course of conduct by causing the Company to purposefully, recklessly or
5  negligently misrepresent its financial results. Because the actions described herein occurred under
6  the authority of the Board, each of the Individual Defendants was a direct, necessary and
7  substantial participant in the conspiracy, common enterprise and/or common course of conduct
8  complained of herein.

9      40.    Each of the Individual Defendants aided and abetted and rendered substantial
10  assistance in the wrongs complained of herein. In taking such actions to substantially assist the
11  commission of the wrongdoing complained of herein, each Individual Defendant acted with
12  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
13  wrongdoing, and was aware of his or her overall contribution to and furtherance of the
14  wrongdoing.

15                          **BACKGROUND**

16      41.    Alliance Gaming is a diversified, worldwide gaming company that designs,
17  manufactures and distributes gaming machines and computerized monitoring systems for gaming
18  machines. It also designs, integrates and sells highly specialized computerized monitoring systems
19  that provide casinos with networked accounting and security services for their gaming machines
20  with over 276,000 game monitoring units installed worldwide. The Company conducts its gaming
21  operations under the name Bally Gaming and Systems. Alliance Gaming also owns and operates a
22  dockside casino in Vicksburg, Mississippi which has approximately 12 table games and
23  approximately 890 gaming devices.

24      42.    Beginning in 2002, the Individual Defendants caused or allowed the Company to
25  issue a series of materially false and misleading statements. These statements remained
26  uncorrected until November 2005, when it was announced that the Company must restate its
27  FY:03 and FY:04 earnings.

28

43.     On September 30, 2002, defendant Lerner sold 15,424 shares at $14.94-$15.31 per share for proceeds of $233,719.56.

44.     On October 14, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "Alliance Gaming Reports First Quarter Earnings of $0.13 Per Share; Bally Gaming and Systems Business Unit Reports 52% Increase in Operating Income on 61% Increase in Unit Sales." The press release stated, in pertinent part, as follows:

> Alliance Gaming Corporation today announced earnings for its first fiscal quarter ending September 30, 2002. Net income (after tax) for the first quarter totaled $6.3 million, or $0.13 per diluted share, on revenues of $146.7 million. For the comparable quarter ended September 30, 2001, the Company reported net income of $7.4 million, or $0.16 per diluted share, on revenues of $130.0 million. Due to the utilization of net operating loss carryforwards and other tax credits, no Federal income tax expense was recognized during the quarter ended September 30, 2001. Assuming Federal income taxes had been recognized, net income and EPS for the quarter ended September 30, 2001 would have been $4.2 million or $0.09 per share, respectively.

45.     From October 17, 2002 to October 22, 2002, defendant Robbins sold 200,000 shares at $16.23-$17.78 per share for proceeds of $3,431,100.00.

46.     On October 22, 2002, defendant DiCesare sold 302,610 shares at $17.69 per share for proceeds of $5,353,179.80.

47.     On October 24, 2002, defendant André sold 20,000 shares at $17.77 per share for proceeds of $355,400.00.

48.     On October 28, 2002, defendant Miodunski sold 37,468 shares at $17.50-$17.51 per share for proceeds of $656,023.

## IMPROPER STATEMENTS

49.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Alliance Gaming a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included the presence of

1    significant material weaknesses in the following areas: (i) inadequate staffing and training in
2    finance and accounting; (ii) ineffective controls related to the preparation of certain account
3    analysis, account summaries and account reconciliations; (iii) inadequate controls related to
4    revenue recognition; (iv) inadequate controls related to inventory valuation; (v) ineffective controls
5    related to income taxes; and (vi) ineffective controls at the entity level.  Furthermore, defendants
6    Robbins, Verner, Haddrill, Race and André, as members of the Audit Committee throughout the
7    Relevant Period, had a special duty to know and understand this material information as set out in
8    the Audit Committee's charter which provides that the Audit Committee shall represent and assist
9    the Board of Directors in discharging its oversight responsibility relating to, among other things:
10   (i) the accounting, reporting and financial practices of the Company and its subsidiaries, including
11   the integrity of the Company's financial statements; (ii) the surveillance of administration and
12   financial controls and the Company's compliance with legal and regulatory requirements; and (iii)
13   the performance of the Company's internal audit function and the Company's outside auditor.
14   Defendants Miodunski, Haddrill, Saxton, Des Champs and Lerner, as officers of Alliance Gaming,
15   had ample opportunity to discuss this material information with their fellow officers at
16   management meetings and via internal corporate documents and reports.  Moreover, defendants
17   Miodunski, André, Robbins, DiCesare, Kirschbaum, Verner, Haddrill and Race, as directors of
18   Alliance Gaming had ample opportunity to discuss this material information with management and
19   fellow directors at any of the thirty-three Board meetings that occurred during the Relevant Period
20   as well as at meetings of Committees of the Board.  Despite these duties, the Individual Defendants
21   negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the
22   following improper statements to be disseminated by Alliance Gaming to the investing public and
23   the Company's shareholders during the Relevant Period.

24        50.      On October 31, 2002, the Individual Defendants caused or allowed the Company to
25   file its 1Q:03 Form 10-Q with the SEC.  The Form 10-Q, which announced increased 1Q:03
26   revenues in comparison to 1Q:02, stated, in pertinent part, as follows:

27            For the quarter ended September 30, 2002, the Bally Gaming and Systems
28            business unit reported revenues of $63.5 million, an increase of 40% compared to

revenues of $45.3 million in the prior year quarter. Gaming Products sales totaled $33.8 million, an increase of 61% compared to $20.9 million in the prior year quarter.

\* \* \*

For the quarter ended September 30, 2002, the overall gross margin percentage for Bally Gaming and Systems improved to 59% compared to 57% in the prior year quarter. The improvement was due to improved margin contribution for gaming machines sales as a result of the improved fixed cost absorption rate resulting from the increased volume of new unit sales.

The Bally Gaming and Systems business unit reported operating income of $15.1 million, compared to an operating income of $9.9 million in the prior year quarter. The increase in operating income resulted primarily from increases in revenues and improved margins, as well as the reduced overhead cost structure. Research and development costs totaled $4.0 million, an increase of 30% compared to the prior year quarter.

51.     The 1Q:03 Form 10-Q was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934. Further, defendants Miodunski and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002. The certifications provided in part:

Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

52.     On November 11, 2002, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Announces Definitive Agreement to Acquire Sierra Design Group." The press release stated, in pertinent part, as follows:

Alliance Gaming Corp. announced today that it has signed a definitive agreement to acquire privately-held Sierra Design Group (SDG), a leading supplier of Class II and Class III gaming devices, systems and technology.

Under terms of the agreement, Alliance Gaming will purchase 100 percent of the outstanding shares of SDG for approximately $45 million of consideration consisting of $27 million of cash and 736,000 shares of Alliance Gaming Common Stock (valued at $18 million) paid at closing and approximately $95 million of contingent consideration payable in equal portions of cash and stock payable over

- 23 -

the three years following the closing upon SDG achieving certain financial objectives. The acquisition, which is subject to regulatory approvals and certain other customary closing conditions, is expected to close in the first half of calendar 2004.

53.    The Individual Defendants knew or should have known that the Sierra acquisition would be consummated with inflated stock because of false and misleading statements issued and as a result, the Company would be exposed to liability for violations of federal securities law.

54.    On November 18, 2002, defendant Saxton sold 89,980 shares at $16.72-$16.84 per share for proceeds of $1,506,936.

55.    On December 6, 2002, defendant Saxton sold 138,180 shares at $16.70-$17.43 per share for proceeds of $2,266,924.

56.    From December 11, 2002 to December 12, 2002, defendant DiCesare sold 26,800 shares at $18.00-$18.03 per share for proceeds of $482,454.

57.    On December 20, 2002, defendant Miodunski sold 75,484 shares at $16.65 per share for proceeds of $1,256,808.60.

58.    On December 23, 2002, defendant Des Champs sold 4,000 shares at $17.16 per share for proceeds of $68,640.

59.    On December 30, 2002, defendant Lerner sold 9,144 shares at $16.63-$16.77 per share for proceeds of $152,922.

60.    On January 6, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Alliance Gaming Announces Second Quarter Earnings" in which it announced the release of its 2Q:03 earnings.

61.    On February 12, 2003, the Individual Defendants caused or allowed the Company to file its 2Q:03 Form 10-Q, which was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934.    Further, defendants Miodunski and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002. The certifications were substantially identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

62.    From March 27, 2003 to March 28, 2003, defendant Lerner sold 10,832 shares at $15.40-$15.50 per share for proceeds of $167,931.

63.     On April 14, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Alliance Gaming Reports Third Quarter Earnings of $0.25 Per Share; Raises Fiscal 2003 Guidance to $0.88; Provides First guidance for Fiscal 2004" in which it announced its 3Q:03 earnings results. The press release stated, in pertinent part, as follows:

> Alliance Gaming Corporation today announced earnings for its third fiscal quarter ending March 31, 2003. *Net income (after tax) for the third quarter totaled $12.8 million, or $0.25 per diluted share, on revenues of $175.5 million.* For the comparable quarter ended March 31, 2002, the Company reported net income of $15.9 million, or $0.32 per diluted share, on revenues of $155.0 million, which period included no Federal income tax expense due to the utilization of net operating loss carryforwards and other tax credits. Assuming Federal income taxes had been recognized for the quarter ended March 31, 2002, net income and EPS would have been $11.1 million or $0.22 per diluted share, respectively.

> ***Results for the March 2003 quarter include***:

> •  Record consolidated revenues of $175.5 million, an increase of 13% from the $155.0 million in the prior year quarter, led by a 43% increase in revenues at the Bally Gaming and Systems business unit.

> •  Record consolidated EBITDA, of $35.7 million, an increase of 9% from the $32.8 million in the prior year quarter, led by a 42% increase at Bally Gaming and Systems.

> •  Consolidated operating income of $25.3 million, an increase of 2% from the $24.7 million in the prior year quarter.

> •  Net income (after tax) of $0.25 per diluted share, an increase of 14% compared to the prior year quarter after-tax earnings of $0.22 per diluted share.

> ***Fiscal Year 2003 Guidance Update***:

> •  For the fiscal year ending June 30, 2003, the Company is raising its guidance for net income per diluted share to at least $0.88.

> ***Fiscal Year 2004 Guidance***:

> •  For fiscal 2004, the Company expects net income per diluted share of at least $1.08 on 50.5 million shares outstanding on a fully taxed basis.

64.     From May 5, 2003 to May 9, 2003, defendant Miodunski sold 126,048 shares at $16.19-$16.50 per share for proceeds of $2,051,058.70.

1  65.  On May 8, 2003, defendant Saxton sold 75,000 shares at $16.65 per share for
2  proceeds of $1,248,705.00.

3  66.  On May 12, 2003, the Individual Defendants caused or allowed the Company to file
4  its 3Q:03 Form 10-Q with the SEC. The 3Q:03 Form 10-Q was signed by defendant Saxton
5  pursuant to the requirements of the Securities Exchange Act of 1934. Further, defendants
6  Miodunski and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of
7  2002. The certifications were substantially identical to the certifications filed in conjunction with
8  the Company's 1Q:03 Form 10-Q.

9  67.  On August 4, 2003, the Individual Defendants caused or allowed the Company to
10  issue a press release entitled "Alliance Gaming Reports Fiscal 2003 EPS of $0.81 from Continuing
11  Operations; Revenues Increase 38% to $407.6 Million; Provides EPS Guidance for Fiscal 2004 of
12  At Least $1.10" in which it announced its 4Q:03 earning results. The press release stated, in
13  pertinent part, as follows:

14  Alliance Gaming Corporation today announced earnings for its fourth fiscal
15  quarter ending June 30, 2003. *Income from continuing operations for the fourth
   quarter totaled $15.0 million, or $0.30 per diluted share, on revenues from
16  continuing operations of $121.1 million.* For the comparable quarter ended June
   30, 2002, the Company reported income from continuing operations (before one-
17  time tax benefit of $37 million) of $10.8 million, or $0.22 per diluted share, on
   revenues of $86.5 million. For the fiscal year ended June 30, 2003, income from
18  continuing operations totaled $40.4 million or $0.81 per diluted share, compared to
   $30.0 million or $0.63 per diluted share for the prior year (before the one-time tax
19  benefit). The fiscal 2002 results included no Federal income tax expense due to the
20  utilization of net operating loss carry forwards and other tax credits. Assuming
   Federal income taxes had been recognized in fiscal 2002, EPS from continuing
21  operations would have been $0.09 and $0.34 for the quarter and fiscal year ended
22  June 30, 2002, respectively.

23  * * *

24  Fiscal Year 2004 Guidance:

25  For fiscal 2004, the Company expects earnings from continuing operations of at
26  least $1.10 per diluted share on revenues of approximately $460 million and
   EBITDA of approximately $130 million. *This fiscal year 2004 earnings guidance
27  reflects a 36% increase in earnings per share as compared to $0.81 of earnings
   from continuing operations for fiscal 2003.* This guidance reflects the lower
28

interest expense associated with the anticipated refinancing transaction, but is a non-GAAP financial measure as it excludes the effects of two previously reported items which are anticipated to occur in fiscal 2004, including: 1) the net gain from the sale of the Route Operations of at least $0.60 per share, and 2) an after tax charge of approximately $0.16 per share related to the refinancing transaction including $5 million for the early extinguishment of the 10% Subordinated Notes and $7 million for the non-cash write-off of unamortized debt issue costs.

68.     On August 7, 2003 defendant Kirschbaum sold 500,000 shares at $20.35 per share for proceeds of $10,175,000.

69.     From August 7, 2003 to August 8, 2003, defendant DiCesare sold 400,336 shares at $20.57-$20.68 per share for proceeds of $8,238,266.50.

70.     On August 11, 2003, defendant Miodunski sold 33,330 shares at $21.24 per share for proceeds of $707,929.20.

71.     On August 11, 2003, defendant Des Champs sold 4,562 shares at $21.10-$21.24 per share for proceeds of $96,462.88.

72.     From August 12, 2003 to August 18, 2003, defendant Saxton sold 94,125 shares at $21.04-$21.40 per share for proceeds of $1,998,341.80.

73.     On August 20, 2003, defendant André sold 50,000 shares at $21.28 per share for proceeds of $304,048.64

74.     On August 28, 2003, defendant Robbins sold 37,468 shares at $22.01-$22.01 per share for proceeds of $1,100,670.

75.     On September 5, 2003, defendant Lerner sold 6,668 shares at $23.43 per share for proceeds of $156,231.24.

76.     On September 29, 2003, the Individual Defendants caused or allowed the Company to file its Form 10-K with the SEC. The Form 10-K was signed pursuant to the requirements of the Securities Exchange Act of 1934 by defendants Miodunski, Saxton, André, DiCesare, Kirschbaum, Robbins, Haddrill and Verner. Further, the Form 10-K was certified pursuant to Section 302 of the Sarbanes Oxley Act of 2002 by defendants Miodunski and Saxton.   The certifications were substantially identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

77.    On October 15, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Alliance Gaming Reports First Quarter EPS of $0.20 From Continuing Operations, or $0.05 After Refinancing Charge; Bally Gaming and Systems Operating income Increases 41% on 39% Increase in Revenues" in which it released its 1Q:04 earnings results.  The press release stated, in pertinent part, as follows:

> Alliance Gaming Corporation today announced earnings for its first fiscal quarter ending September 30, 2003. First quarter income from continuing operations totaled $0.05 per diluted share, or $0.20 per diluted share excluding a $0.15 per share charge resulting from the Company's bank refinancing and early retirement of its subordinated notes. Excluding the refinancing charge, earnings increased 54% compared to the $0.13 per diluted share for the prior year quarter.

78.    On November 11, 2003, the Individual Defendants caused or allowed the Company to file its 1Q:04 Form 10-Q with the SEC.  The 1Q:04 Form 10-Q was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934.  Further, defendants Miodunski and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002.  The certifications were substantially identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

79.    On November 11, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Alliance Gaming Announces Definitive Agreement to Acquire Sierra Design Group."  The press release stated, in pertinent part, as follows:

> Alliance Gaming Corp. announced today that it has signed a definitive agreement to acquire privately-held Sierra Design Group (SDG), a leading supplier of Class II and Class III gaming devices, systems and technology.
>
> *Under terms of the agreement, Alliance Gaming will purchase 100 percent of the outstanding shares of SDG for approximately $45 million of consideration consisting of $27 million of cash and 736,000 shares of Alliance Gaming Common Stock (valued at $18 million) paid at closing and approximately $95 million of contingent consideration payable in equal portions of cash and stock payable over the three years following the closing upon SDG achieving certain financial objectives.*   The acquisition, which is subject to regulatory approvals and certain other customary closing conditions, is expected to close in the first half of calendar 2004.
>
> *"The acquisition of Sierra Design Group makes a powerful statement about Alliance Gaming's plans for future growth while giving us an immediate*

- 28 -

*impact in new and emerging markets," said Robert Miodunski, President and Chief Executive Officer of Alliance Gaming.*

"SDG has become a strong player in the gaming industry in a short period of time through its customer relationships, innovative products and an overriding commitment to cutting-edge technology," Miodunski added. "Bally Gaming and Systems offers a world-class combination of games and systems and adding SDG's products and technology to our portfolio of products takes our company to a new level of strength within our industry. With the emerging VLT and "racino" markets poised for growth both domestically and internationally, we are now favorably positioned to be a significant provider of technology to these markets."

80.     On December 23, 2003, defendant Des Champs sold 6,000 shares at $24.98 per share for proceeds of $149,880.00.

81.     On January 15, 2004, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Reports Second Quarter *EPS Up 64% to $0.28 From Continuing Operations; Provides Guidance for Fiscal Year 2004 and 2005*; Bally Gaming and Systems Business Unit Reports 25% Increase In Operating Income on 11% Increase In Revenues." The press release stated, in pertinent part, as follows:

Alliance Gaming Corporation today announced earnings for its second fiscal quarter ending December 31, 2003. Second quarter income from continuing operations totaled $14.2 million, or $0.28 per diluted share, on revenues of $108.6 million. For the comparable quarter ended December 31, 2002, the Company reported income from continuing operations of $8.6 million or $0.17 per diluted share, on revenues of $98.2 million. The results for the Company's continuing operations for the current and prior year periods are presented after classifying the results of the Rail City Casino as discontinued operations, which had the effect of reclassifying EPS of $0.02 in both quarters from income from continuing operations to income from discontinued operations.

                                        *   *   *

*Fiscal Year 2004 Guidance*

        *The Company is updating its fiscal year 2004 guidance for continuing operations from $1.10 per diluted share, to at least $1.04, reflecting the reclassification of $0.06 of EPS for Rail City Casino to discontinued operations. This guidance also reflects the inclusion of SDG's results that we are now forecasting will not be dilutive to our fiscal year 2004 results, which we had previously guided could have been dilutive by as much as $(0.10). The comparative EPS for the prior fiscal year 2003 was $0.74, which has also been adjusted to reclassify the Rail City Casino as discontinued operations.*

*Fiscal Year 2005 Guidance*

        *For fiscal 2005, the Company expects EPS for continuing operations of at least $1.40, representing an increase of 35% compared to fiscal year 2004.*

82.   On January 20, 2004, defendant Des Champs sold 23,259 shares at $24.18-$24.27 per share for proceeds of $563,140.62.

83.   From January 20, 2004 to January 21, 2004, defendant Miodunski sold 66,662 of his shares at $24.17-$24.30 per share for proceeds of $1,613,469.54.

84.   On January 21, 2004, the Individual Defendants caused or allowed the Company to file its Form 10-Q for 2Q:04, which repeated the financial information contained in the January 15, 2004 press releases. The 2Q:04 Form 10-Q was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934. Further, defendants Miodunski and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002. The certifications were substantially identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

85.   On March 3, 2004, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Announces Completion of the Acquisition of Sierra Design Group." The press release stated, in pertinent part, as follows:

> Alliance Gaming Corp. announced today that it has completed the acquisition of privately held Sierra Design Group (SDG), a leading supplier of Class II and Class III gaming devices, systems and technology.
>
> Pursuant to the purchase agreement, Alliance Gaming acquired 100 percent of the outstanding shares of SDG for approximately $28.3 million of cash and 662,000 shares of Alliance Gaming Common Stock valued at $16.0 million.

86.   The Individual Defendants knew or should have known that the consummation of the Sierra acquisition with artificially inflated stock would expose Alliance Gaming to liability for violations of federal securities laws.

87.   On March 4, 2004, following conference calls during which the Individual Defendants caused or allowed the Company to issue materially false and misleading projections for FY:04 and FY:05, Alliance Gaming's price target was raised by Deutsche Bank to $32.00 per share from $27.00 per share. Deutsche Bank analyst Marc J. Falcone reiterated "buy" as his recommendation.

88.   On March 4, 2004, the same day of the Deutsche Bank report, defendant Lerner sold 22,497 shares at $27.60 per share for proceeds of $620,917.20.

89.     On March 16, 2004, to quash concerns about the impact of potential new taxes on the Company's future, defendant Saxton appeared on CNBC and proclaimed that "Taxes Won't Hurt Industry."

> SAXTON: [W]e've seen some states, in this past year, particularly, that tried to put some onerous taxes [on casinos, and] as a result, the industry suffered dramatically. I don't think we are going to be faced with a significant amount of over taxation.

> * * *

> SAXTON: Online gaming, I don't believe is going to be a threat to us [because] ... the ability to control the games and control the integrity of those games is so difficult today....

90.     On April 21, 2004, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Reports Third Quarter EPS Up 33% to $0.24 From Continuing Operations; Reaffirms Fiscal Year 2004 and 2005 Guidance." The press release stated, in pertinent part, as follows:

> Alliance Gaming Corporation today announced earnings for its third fiscal quarter ending March 31, 2004. Third quarter income from continuing operations totaled $12.2 million, or $0.24 per diluted share, on revenues of $116.2 million. For the comparable quarter ended March 31, 2003, the Company reported income from continuing operations of $8.9 million or $0.18 per diluted share, on revenues of $96.2 million. The results for the current quarter include Sierra Design Group (SDG) since the date of its acquisition on March 2, 2004.

> * * *

> *Earnings Guidance*

> *The Company is reaffirming its fiscal year 2004 earnings guidance for continuing operations of $1.04 per diluted share (excluding the refinancing charge of $0.15 per diluted share). The comparative EPS for the prior fiscal year 2003 was $0.74.*

> *The Company is also reaffirming its fiscal year 2005 earnings guidance of at least $1.40 per diluted share, representing an increase of 35% compared to fiscal year 2004.*

91.     On April 27, 2004, defendant Miodunski sold 33,340 shares at $26.75 per share for proceeds of $891,845.

92.     On May 14, 2004, the Individual Defendants caused or allowed the Company to file its 3Q:04 Form 10-Q, which was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934. Further, defendants Miodunski and Saxton signed certifications

- 31 -

1  pursuant to Section 302 of the Sarbanes Oxley Act of 2002. The certifications were substantially

2  identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

3      93.    On June 8, 2004, before the market opened, the Individual Defendants caused or

4  allowed the Company to issue a press release entitled "Alliance Gaming Updates Guidance for

5  Fiscal Year 2004 and 2005." The press release stated, in pertinent part, as follows:

6      Fiscal Year 2004

7      For fiscal year ending June 30, 2004, the Company sees earnings from continuing
        operations in the range of $0.96 to $1.00 per share, compared to the prior guidance
8      of $1.04.

9                              *  *  *

10     Fiscal Year 2005

11     The Company also revised its earnings guidance for fiscal year 2005 to a range of
        $1.20 to $1.30 on a fully diluted basis on revenues of $600 million, with stronger
12     sales levels expected in the latter half of the fiscal year.

13     94.    On this news that the Company would fall seriously short of previous forecasts, the

14  Company's shares were punished. The Company's shares plummeted 25% on June 8, 2004 on

15  record volume of 13 million shares.

16     95.    On June 30, 2004, defendant Miodunski entered into a Separation and Consultation

17  Agreement ("Separation Agreement") pursuant to which Miodunski resigned as President and

18  CEO effective September 30, 2004. Pursuant to the Separation Agreement, the Company agreed

19  to pay Miodunski a "special bonus" of $1,000,000 for the divesture of United Coin Machine, Co.

20  The Separation Agreement also provided that Miodunski would be eligible for another bonus at the

21  end of FY:05 (June 30, 2005) and would be paid $250,000 annually for services as a consultant to

22  the Board through 2008. Furthermore, all of Miodunski's issued and outstanding stock options

23  continued to vest and be exercisable as if Miodunski had retained his employment.

24     96.    Also on June 30, 2004, defendant Haddrill and the Company entered into an

25  employment agreement, pursuant to which he began serving as the Company's CEO and President.

26     97.    On July 1, 2004, the Individual Defendants caused or allowed Alliance Gaming to

27  issue a press release entitled "Alliance Gaming Announces Appointment of Richard Haddrill as

28

- 32 -

1  Chief Executive Officer." The release disclosed, without further explanation, that Miodunski had

2  relinquished his positions as CEO and President to defendant Haddrill.

3       98.     On August 10, 2004, the Individual Defendants caused or allowed the Company to

4  issue a press release entitled "Alliance Gaming Reports 35% Increase in Fiscal Year 2004 EPS of

5  $1.00 From Continuing Operations ... Revises Fiscal Year 2005 Guidance to be Flat Compared to

6  Fiscal Year 2004" in which it announced its FY:04 earnings. The press release stated, in pertinent

7  part, as follows:

8  
9       Alliance Gaming Corporation today announced earnings for its fourth fiscal
     quarter ending June 30, 2004. Fourth quarter income from continuing operations
10       totaled $15.3 million, or $0.30 per diluted share, on revenues of $162.8 million.
     For the comparable prior year quarter ended June 30, 2003, the income form
11       continuing operations totaled $14.1 million or $0.28 per diluted share, on revenues
     of $115.7 million.

12  
     Guidance for Fiscal Year 2005
13  
14       *The Company is revising its Fiscal Year 2005 earnings to be approximately flat*
     *to Fiscal Year 2004 results from continuing operations, as a result of changes in*
15       *current marker conditions and uncertainty surrounding the gaming initiatives in*
     *emerging jurisdictions.* The Company also believes that the earnings will be
16       weighted approximately 25% in the first half of the fiscal year, with particular
     softness in the first quarter.

17       99.     On September 13, 2004, the Individual Defendants caused or allowed the Company

18  to file its FY:04 10-K. The Form 10-K was signed pursuant to the requirements of the Securities

19  Exchange Act of 1934 by defendants Miodunski, Saxton, André, DiCesare, Kirschbaum, Robbins,

20  Haddrill and Verner. Further, the Form 10-K was certified pursuant to Section 302 of the Sarbanes

21  Oxley Act of 2002 by defendants Miodunski and Saxton. The certifications were substantially

22  identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

23       100.     On September 30, 2004, the Individual Defendants caused or allowed the Company

24  to issue a press release entitled "Alliance Gaming Provides First Quarter Guidance and Sets

25  Earnings Release Date and Conference Call," in which it announced that 1Q:05 earnings would be

26  lower than anticipated. The press release stated, in pertinent part:

27  
28       *Alliance Gaming Corp. today announced that it expects first quarter operating*
     *results to be a loss from continuing operations in the range of $0.09 to $0.14 per*

*share*, excluding the previously announced charge against discontinued operations of approximately $0.09 per share for the jury award related to certain devices operated by a former subsidiary, United Coin Machine Co. Both the Games and Systems divisions of the Company's Bally Gaming subsidiary contributed to the quarter's weakness, along with a small impact of certain charges related to the transition of the Company's CEO and costs associated with a recent staff restructuring. The Company is currently reviewing its annual guidance.

101.    On October 21, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Alliance Gaming Reports First Quarter Loss of ($0.13) From Continuing Operations." The press release announced not only that 1Q:05 earnings were lower than anticipated but that due to an extensive review of operations and strategic planning processes, the Company would no longer provide any guidance for FY:05. The press release stated, in pertinent part, as follows:

Alliance Gaming Corporation today announced its results for its first fiscal quarter ending September 30, 2004. First quarter loss from continuing operations totaled $(6.4) million, or $(0.13) per diluted share, on revenues of $116.9 million. For the comparable prior year quarter ended September 30, 2003, the Company reported income from continuing operations of $1.8 million or $0.04 per diluted share (or $0.19 excluding the refinancing charge), on revenues of $101.2 million.

\* \* \*

**Guidance:**

The Company has undertaken an extensive review of its operations and a strategic planning process in order to take advantage of current and emerging market opportunities to drive long-term shareholder value. *Given the extent of those actions, and the inherent uncertainty relating to the Company's recent changes, the Company is no longer providing guidance for fiscal year 2005; however, based on expected business trends and conditions, the Company is cautiously optimistic that it will return to profitability for the second half of fiscal year 2005.*

102.    On November 9, 2004, the Individual Defendants caused or allowed the Company to file its 1Q:05 Form 10-Q, which was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934. Further, defendants Haddrill and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002. The certifications were substantially identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.

1

**THE RESTATEMENT, THE DELAYED FILING OF THE ANNUAL REPORT
AND THE SEC INVESTIGATION**

2

3

4

5

6

7

8

103.    On February 9, 2005, the Individual Defendants caused or allowed Alliance Gaming to file its Form 10-Q for the quarterly period ending December 31, 2004, which was signed by defendant Saxton pursuant to the requirements of the Securities Exchange Act of 1934. Further, defendants Haddrill and Saxton signed certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002.   The certifications were substantially identical to the certifications filed in conjunction with the Company's 1Q:03 Form 10-Q.  The Form 10-Q provides, in pertinent part, as follows:

9

Legal Proceedings

10

11

12

In February 2005, the Securities and Exchange Commission (the "SEC") requested documents and information regarding matters related to the allegations in the class actions and similar matters.  Management is cooperating fully with the SEC in this matter.

13

14

15

16

17

104.    On August 9, 2005, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Provides General Business Update and 2006 Guidance"  The release disclosed with little additional explanation that the date of the Company's fourth quarter and year end earnings release, previously scheduled for August 9, 2005, would be delayed.

18

19

20

21

105.    This news caused another down turn in the market price for Company's shares.  On August 10, 2005 Alliance Gaming's stock opened at $14.25, almost a dollar lower than the previous day's closing price, and sank throughout the day until it closed at $12.68 on a volume of 3.8 million shares.

22

23

24

106.    On September 8, 2005, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Provides Update on Year End Reporting and Other Business Matters"  The press release stated in part:

25

Year End Reporting

26

27

28

The Company has not yet completed its annual accounting and financial reporting process for the fiscal year ended June 30, 2005.  In the course of the annual closing and audit process, several transactions came under review principally with respect to the timing of revenue recognition, which has led the Company, with the assistance of outside consultants, to undertake a broader review of the Company's

1    sale contracts as well as its revenue recognition practices.

2                                    *  *  *

3    Until the detailed review being undertaken by the Company is completed, it will
     not be possible for the Company to determine whether a restatement of certain
4    quarterly results for fiscal year 2005 or other periods will be required.

5                                    *  *  *

6    The Company will not be in a position to file its Annual Report on Form 10-K for
     the fiscal year ended June 30, 2005 by September 13, 2005.  The Company intends
7    to file for a 15 calendar day extension; however, the Company may not be able to
     file the Form 10-K by the extended filing date.

8            Depending on the outcome of the broader review and final reported results
     for the fiscal year, the Company could be in violation of its leverage ratio
9    covenant.  In addition, if the Company is unable to deliver audited financial
     statements and accompanying compliance certificates to its lenders under its credit
10   agreement by September 28, 2005, it will be in default under the credit agreement;
     however, the credit agreement provides for certain notice and cure provisions that
11   would allow the Company until November 4, 2005 to deliver those financial
     statements and the accompanying compliance certificates.
12

13       107.    Once again, the Company's announcement caused its stock to take a beating.  From

14   opening bell on September 8 to closing bell on September 9, the price fell from $11.99 to $10.63

15   on a volume of close to 3 million shares over the two days.

16       108.    On September 14, 2005, Alliance Gaming filed Form NT 10-K with the SEC

17   requesting additional time for filing its annual report on Form 10-K for FY:05.  In its request, the

18   Company confirmed it was reviewing the adequacy of its internal controls over its financial

19   reporting and that it anticipated that material weaknesses in internal controls would likely be

20   identified.  The Form NT 10-K stated, in pertinent part, as follows:

21   Alliance Gaming Corporation (the "Company") hereby requests an extension of
     time to file its Annual Report on Form 10-K for the period ended June 30, 2005.
22   As previously disclosed, the Company was unable to file its Form 10-K by
     September 13, 2005 without unreasonable effort or expense, primarily because the
23   Company has experienced delays in completing preparation of its consolidated
     financial statements for the year ended June 30, 2005 (the "Financial Statements").
24   *More specifically, in the course of the preparation of the Financial Statements,*
     *several transactions came under review, principally with respect to the timing of*
25   *revenue recognition.  As a result, the Company, with the assistance of outside*
     *consultants, is undertaking a broader review of the Company's sales contracts as*
26   *well as its revenue recognition practices.*  The Company is also reviewing other
     accounting areas including, but not limited to, reserves for uncollectible accounts
27   receivable and inventory valuation reserves.  Until the reviews being undertaken
28

                                        - 36 -

by the Company and the external audit process are completed, the Company will be unable to file its Form 10-K. The Company continues to dedicate significant resources to the preparation of the Financial Statements and the finalization of the Form 10-K.

*The Company is also in the process of evaluating the adequacy of its internal controls over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Securities Exchange Act of 1934, as amended, and currently anticipates that material weaknesses in our internal control over financial reporting will likely be identified in the areas of sales contract administration and related revenue recognition practices.* As we complete our assessment of our internal control over financial reporting, we may identify additional control deficiencies and we may determine that those deficiencies, either alone or in combination with others, may also constitute one or more additional material weaknesses.

109.  On September 28, 2005, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Targets November 3rd Filing Date for Form 10-K."

Alliance Gaming Corp. announced today that it estimates that it will be in a position to file its Form 10-K on or around November 3, 2005. The Company continues to work diligently on completing the preparation of its consolidated financial statements for the year ended June 30, 2005, but was not in a position to file the Form 10-K by the extended deadline of September 28, 2005. This estimate of time is subject to the continuing review and may be revised as necessary.

110.  By November 4, 2005, as a direct result of the Individual Defendants delay in filing the Company's Form 10-K for FY:05, Alliance Gaming was in default of its credit agreement and subject to default interest penalties.

111.  On November 7, 2005, the Individual Defendants caused or allowed Alliance Gaming to issue a press release entitled "Alliance Gaming Announces Fiscal Year 2005 Earnings Release Date and Restatement Details." The press release stated, in pertinent part, as follows:

*Restatement of Financial Results*

*. . . the previously issued audited financial statements for the fiscal years ended June 30, 2003 and 2004 and the auditors report thereon, and the unaudited quarterly financial information previously reported for the year ended June 30, 2004 and for the quarters in the nine month period ended March 31, 2005 should no longer be relied upon and will require restatement.*

\* \* \*

Generally, the restatement and accounting changes will result in a downward

- 37 -

1   revision of previously reported EPS of approximately $0.10 to $0.13 in each of the
    fiscal years ended 2003 and 2004, an increase of approximately $0.04 to $0.06 in
2   the nine months ended March 31, 2005, and a carry forward of approximately
    $0.15 to $0.17 to fiscal year 2006.

3   112.   One day later, on November 8, 2005, the Individual Defendants caused or allowed

4   Alliance Gaming to issue a press release entitled "Alliance Gaming Reports Fourth Quarter and

5   Fiscal Year End 2005 Results." Compared to the defendants' April 2004 earnings forecasts of

6   $1.40 per share for FY:05 and $1.04 per share for FY:04, the restatement was stark. The press

7   release stated, in pertinent part, as follows:

8       For fiscal year 2005, the Company reported a loss from continuing operations of
        $(20.3) million, or $(0.40) per share on revenues of $484.0 million, including
9       certain inventory and asset write-downs, restructuring costs and refinancing
        charges that totaled $34.2 million, or $0.51 per share net of tax.
10

11                                      *   *   *

12      For the fiscal year ended June 30, 2004, as restated, the Company reported income
        from continuing operations of $39.7 million or $0.78 per diluted share on revenues
13      of $480.4 million, including a refinancing charge of $12.3 million, or $0.15 per
        diluted share net of tax.

14   113.   On November 10, 2005, the Individual Defendants caused or allowed Alliance

15   Gaming to file a Form NT 10-Q with the SEC requesting additional time for filing its quarterly

16   report on Form 10-Q for the period ending September 30, 2005. In this request, the Company cited

17   the delays it experienced in completing its Form 10-K for FY:05.

18   114.   On December 30, 2005, the Individual Defendants caused or allowed the Company

19   to finally file its Form 10-K for FY:05. On that same day, the Individual Defendants caused or

20   allowed the Company to also announce that as a result of the filing, Alliance Gaming was in

21   compliance with its loan covenants and that the default penalty period had ended. However, with

22   regard to the SEC investigation, the Form 10-K stated:

23   **Legal Proceedings**

24   *In February 2005, the SEC initiated an informal inquiry and requested
     documents and information regarding matters related to the allegations in the
25   class actions and similar matters. In August 2005, the SEC notified the
     Company that its investigation had entered a formal phase, and has requested
26   additional information from the Company covering the same general areas that
     were addressed in the informal inquiry. Management is cooperating fully with
27   the SEC in this matter.*

28

The FY:05 Form 10-K also discussed the restatement announced in September 2005 and certain material weaknesses, in pertinent part, as follows:

**Internal Control Over Financial Reporting**

We have identified material weaknesses in our internal control over financial reporting which are described in Item 9A, Controls and Procedures. *Each of these material weaknesses results in more than a remote likelihood that a material misstatement of the annual or interim financial statement will not be prevented or detected. As a result, we have assessed that our internal control over financial reporting was not effective as of June 20, 2005.*

We are in the process of developing and implementing measures to address these material weaknesses. The key issues identified by management during its assessment were the high level of turnover of certain of our key finance and accounting personnel during fiscal year 2005, our inability to timely replace departed key personnel and the misinterpretation by management of certain complex accounting and tax issues. We are making progress in the implementation of these measures however at present there can be no assurance as to when the implementation of these measures will be completed. *Until such measures are implemented, we will continue to incur the expenses and management burdens associated with the additional resources required to prepare our consolidated financial statements.*

In regards to the material weaknesses and deficient internal controls, the FY:05 10-K provided, in pertinent part, as follows:

**Disclosure Controls and Procedures**

As required by Rule 13a-15(b) promulgated under the Exchange Act, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the design and operating effectiveness as of June 30, 2005 of our disclosure controls and procedures, as defined in Rule 13a-15(e) promulgated under the Exchange Act. *Based on this evaluation our Chief Executive Officer and Chief Financial Officer concluded that, because of the deficiencies in our internal control over financial reporting described below, as of June 30, 2005 our disclosure controls and procedures were not effective.*

\* \* \*

*Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) promulgated under the Exchange Act.* Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of an issuer's financial statements for

external purposes in accordance with accounting principles generally accepted in the United States of America ("GAAP").

\* \* \*

As required by Rule 13a-15(c) promulgated under the Exchange Act, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of June 30, 2005.... *Our assessment identified deficiencies that were determined to be material weaknesses.*

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. *Because of the material weaknesses described below, management concluded that our internal control over financial reporting was not effective as of June 30, 2005.*

*The specific material weaknesses identified by management are described as follows*:

- *Inadequate staffing and training in finance and accounting*: Management has identified two broad issues related to our finance and accounting staff. First, accounting personnel did not have an adequate understanding of the complex rules over revenue recognition and how the application of those rules applied to our evolving business in recent years. This issue contributed to the majority of the dollar amount and number of financial statement adjustments required to fiscal year end 2005 as well the need for the restatement of the previously issued financial statements. Second, a high level of turnover of key finance and accounting personnel in fiscal year 2005, a year in which we were integrating the SDG acquisition, resulted in certain controls not operating effectively as of June 30, 2005. As a result of these two issues, our finance and accounting staff was, in some cases, inadequately trained and, in fiscal year 2005, understaffed. *These weaknesses resulted in material adjustments to fiscal year end 2005 and contributed to the restatement of the 2004 and 2003 consolidated financial statements due to: (i) misinterpretation of certain accounting literature, (ii) lack of understanding and interpretation of customer contracts, (iii) untimely application of accounting principles, (iv) improper classification of certain balance sheet and income statement items and (v) untimely performance of the year end evaluation of obsolete inventory and fixed asset reserves.*

- *Ineffective controls related to the preparation of certain account analyses, account summaries and account reconciliations*:   Certain controls designed to ensure timely preparation, review and approval of certain account analyses and reconciliations did not operate effectively. Specifically, certain reconciliations in areas including accounts receivable,

accrued liabilities, other current assets, and property, plant and equipment were not performed in a timely manner. In certain circumstances we did not adequately follow up or resolve the reconciliation of certain items. *These weaknesses resulted in material adjustments to fiscal year end 2005 and contributed to a restatement of 2004 and 2003 consolidated financial statements.*

- *Inadequate controls related to revenue recognition*:   We did not have appropriate internal controls related to the recognition of revenue for game and system sales, including the lack of a comprehensive contract administration function to address the operating, legal, financial and accounting ramifications of game and system revenue contracts. Our controls were not adequate to capture and analyze the terms and conditions of all contracts to ensure the proper recording of revenue contracts with standard and non-standard terms, including FOB destination provisions, extended payment terms and other contractual arrangements that can affect the timing and amount of revenue to be recognized. Certain of our revenue transactions are accounted for in accordance with the AICPA's Statement of Position 97-2, "Software Revenue Recognition" ("SOP No. 97-2"), as amended, which includes complex revenue recognition criteria that were not always adequately assessed. These weaknesses were the result of a material deficiency in the design of internal control over financial reporting and resulted in material adjustments to fiscal year end 2005 and contributed to the restatement of the 2004 and 2003 consolidated financial statements as follows:

  (i)     decrease in gaming and systems revenues by $6.0 million $8.5 million and $23.2 million in fiscal years 2005, 2004 and 2003, respectively;

  (ii)    decrease in cost of sales by $4.2 million, $2.9 million and $9.9 million in fiscal years 2005, 2004 and 2003, respectively.

- *Inadequate controls related to inventory valuation*:   The Company did not design and implement sufficient controls related to the valuation of inventory. As a result inventory, prior to year-end adjustments was not stated at the lower of cost or market value due to the following: (i) certain manufacturing labor and overhead costs were not charged to inventory because we did not accurately assess the purchase price variance associated with the use of standard costs within our accounting systems, (ii) the restocking of excess inventory pulled for work orders was not always properly identified and removed from the bill of materials and (iii) certain packaging materials had not always been properly charged to cost of sales. This weakness resulted in material adjustments to fiscal year end 2005 and contributed to the restatement of the 2004 and 2003 consolidated financial statements. The net effect of these adjustments increased cost of goods sold

by $1.9 million, $0.7 million and $0.6 million for the fiscal years ended June 30, 2005, 2004 and 2003 respectively.

- *Ineffective controls related to income taxes*:  Our policies and procedures did not include adequate review of certain complex income tax issues, resulting in material deficiencies in the operating effectiveness of internal controls over financial reporting.   These deficiencies resulted in an adjustment of our effective tax rate resulting from the establishment of reserves for certain tax credits, and additional U.S. and foreign deferred tax expense related to our foreign operations. Certain adjustments were also required for deferred taxes related to a prior acquisition totaling $8.3 million as of June 30, 2004.

- *Ineffective controls at the entity level*:    As evidenced by the material weaknesses described above, and management's final assessment of our internal controls, we have determined that our entity-level controls related to the control environment, risk assessment, monitoring function and dissemination of information and communication activities did not operate effectively, resulting in a material weakness in each COSO component. Such entity level controls, and a comprehensive monitoring of internal controls by the internal audit function, are part of the framework to ensure that the designed system of internal control is operating effectively to ensure that significant transactions are adequately identified, recorded and disclosed.

115.    As of the date of this Complaint, the Company has not yet filed its Form 10-Q for either 1Q:05 or 2Q:05.  On February 10, 2006, the Individual Defendants caused or allowed the Company to file a NT 10-Q which announced that it currently anticipated that both filings would be filed on March, 24, 2006.

116.    On March 16, 2006, the Individual Defendants caused or allowed the Company to issue a press release entitled "Bally Technologies Announces Company Begins Trading on the NYSE Under Ticker Symbol BYI," in which the Company officially announced that it was changing its name to Bally Technologies, Inc.

117.    As a result of the Individual Defendants misconduct during the Relevant Period, the Company's market capitalization was damaged by $1.3 billion.  At the same time that the defendants were causing Alliance Gaming to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $44 million of their personally held stock.

## REASONS THE STATEMENTS WERE IMPROPER

118.    The true facts, which were known or should have been known by each of the Individual Defendants during the Relevant Period and which have exposed the Company to extensive harm and liability included:

(a)    The Company was experiencing massive problems/delays associated with the Company's WAP games in Nevada due to regulatory hold ups;

(b)    The Company was experiencing massive delays in its approval and deployment of New York VLT game revisions;

(c)    The Company's margins were being slashed by increased costs associated with the Company's central and traditional determination products;

(d)    The Company's acquisition of Sierra was suffering from massive integrative problems.  Moreover, Sierra's strength in the New York video lottery business had faded causing defendants to question whether Alliance Gaming had, in fact, overpaid for Sierra;

(e)    The Company was losing its competitive position and experiencing problems in the Company's game unit (video product);

(f)    The Company was relying upon improper revenue recognition policies and improper tax rates; and

(g)    As a result of (a)-(f) above, the Individual Defendants' forecasts for FY:04 of $1.04 and FY:05 of $1.40 per share, were grossly inflated, and the Company's previously reported earnings for these periods were materially overstated.

## ILLEGAL INSIDER SELLING

119.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Alliance Gaming stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Steven Des Champs | 1/20/2004 | 7,499 | $ 24.18 | $ 181,325.82 |
| | 1/20/2004 | 8,200 | $ 24.27 | $ 199,014.00 |
| | 1/20/2004 | 228 | $ 24.18 | $ 5,513.04 |
| | 1/20/2004 | 7,272 | $ 24.18 | $ 175,836.96 |
| | 12/23/2003 | 6,000 | $ 24.98 | $ 149,880.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 8/11/2003 | 1,462 | $ | 21.24 | $ | 31,052.88 |
| | 8/11/2003 | 3,100 | $ | 21.10 | $ | 65,410.00 |
| | 12/23/2002 | 4,000 | $ | 17.16 | $ | 68,640.00 |
| | | **37,761** | | | $ | **876,672.70** |
| | | | | | | |
| Robert L. Miodunski | 4/27/2004 | 16,736 | $ | 26.75 | $ | 447,688.00 |
| | 4/27/2004 | 16,604 | $ | 26.75 | $ | 444,157.00 |
| | 1/21/2004 | 17,300 | $ | 24.30 | $ | 420,390.00 |
| | 1/20/2004 | 33,330 | $ | 24.17 | $ | 805,586.10 |
| | 1/20/2004 | 16,032 | $ | 24.17 | $ | 387,493.44 |
| | 8/11/2003 | 33,330 | $ | 21.24 | $ | 707,929.20 |
| | 5/9/2003 | 33,360 | $ | 16.50 | $ | 550,440.00 |
| | 5/5/2003 | 92,688 | $ | 16.19 | $ | 1,500,618.72 |
| | 12/20/2002 | 75,484 | $ | 16.65 | $ | 1,256,808.60 |
| | 10/28/2002 | 33,300 | $ | 17.51 | $ | 583,083.00 |
| | 10/28/2002 | 4,168 | $ | 17.50 | $ | 72,940.00 |
| | | **372,332** | | | $ | **7,177,134.06** |
| | | | | | | |
| Robert L. Saxton | 8/18/2003 | 27,444 | $ | 21.10 | $ | 579,068.40 |
| | 8/18/2003 | 10,000 | $ | 21.15 | $ | 211,500.00 |
| | 8/18/2003 | 10,000 | $ | 21.20 | $ | 212,000.00 |
| | 8/18/2003 | 10,000 | $ | 21.08 | $ | 210,800.00 |
| | 8/12/2003 | 16,665 | $ | 21.40 | $ | 356,631.00 |
| | 8/12/2003 | 20,016 | $ | 21.40 | $ | 428,342.40 |
| | 5/8/2003 | 75,000 | $ | 16.65 | $ | 1,248,750.00 |
| | 12/6/2002 | 3,000 | $ | 17.38 | $ | 52,140.00 |
| | 12/6/2002 | 4,200 | $ | 17.39 | $ | 73,038.00 |
| | 12/6/2002 | 500 | $ | 17.42 | $ | 8,710.00 |
| | 12/6/2002 | 3,500 | $ | 17.43 | $ | 61,005.00 |
| | 12/6/2002 | 14,000 | $ | 17.45 | $ | 244,300.00 |
| | 12/6/2002 | 3,000 | $ | 17.40 | $ | 52,200.00 |
| | 12/6/2002 | 8,000 | $ | 17.35 | $ | 138,800.00 |
| | 12/6/2002 | 4,500 | $ | 17.31 | $ | 77,895.00 |
| | 12/6/2002 | 3,000 | $ | 17.30 | $ | 51,900.00 |
| | 12/6/2002 | 4,500 | $ | 17.43 | $ | 78,435.00 |
| | 11/18/2002 | 39,980 | $ | 16.75 | $ | 669,665.00 |
| | 11/18/2002 | 9,100 | $ | 16.72 | $ | 152,152.00 |
| | 11/18/2002 | 17,300 | $ | 16.70 | $ | 288,910.00 |
| | 11/18/2002 | 5,000 | $ | 16.75 | $ | 83,750.00 |
| | 11/18/2002 | 2,000 | $ | 16.73 | $ | 33,460.00 |
| | 11/18/2002 | 8,500 | $ | 16.80 | $ | 142,800.00 |
| | 11/18/2002 | 2,200 | $ | 16.84 | $ | 37,048.00 |
| | 11/18/2002 | 3,000 | $ | 16.82 | $ | 50,460.00 |
| | 11/18/2002 | 2,900 | $ | 16.79 | $ | 48,691.00 |
| | | **307,305** | | | $ | **5,592,450.80** |
| | | | | | | |
| Mark Lerner | 3/4/2004 | 13,926 | $ | 27.60 | $ | 384,357.60 |
| | 3/4/2004 | 7,499 | $ | 27.60 | $ | 206,972.40 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | | 3/4/2004 | 1,072 | $ | 27.60 | $ | 29,587.20 |
| | | 9/5/2003 | 6,668 | $ | 23.43 | $ | 156,231.24 |
| 2 | | 3/27/2003 | 4,800 | $ | 15.50 | $ | 74,400.00 |
| | | 3/27/2003 | 200 | $ | 15.53 | $ | 3,106.00 |
| 3 | | 3/28/2003 | 900 | $ | 15.53 | $ | 13,977.00 |
| | | 3/28/2003 | 400 | $ | 15.50 | $ | 6,200.00 |
| 4 | | 3/28/2003 | 100 | $ | 15.48 | $ | 1,548.00 |
| 5 | | 3/28/2003 | 1,100 | $ | 15.40 | $ | 16,940.00 |
| | | 3/28/2003 | 2,500 | $ | 15.54 | $ | 38,850.00 |
| 6 | | 3/28/2003 | 632 | $ | 15.52 | $ | 9,808.64 |
| | | 3/28/2003 | 200 | $ | 15.51 | $ | 3,102.00 |
| 7 | | 12/30/2002 | 800 | $ | 16.63 | $ | 13,304.00 |
| 8 | | 12/30/2002 | 500 | $ | 16.66 | $ | 8,330.00 |
| | | 12/30/2002 | 2,700 | $ | 16.67 | $ | 45,009.00 |
| 9 | | 12/30/2002 | 1,200 | $ | 16.72 | $ | 20,064.00 |
| | | 12/30/2002 | 3,144 | $ | 16.73 | $ | 52,599.12 |
| 10 | | 12/30/2002 | 800 | $ | 16.77 | $ | 13,416.00 |
| 11 | | 9/30/2002 | 2,500 | $ | 15.31 | $ | 38,275.00 |
| | | 9/30/2002 | 3,000 | $ | 15.29 | $ | 45,870.00 |
| 12 | | 9/30/2002 | 3,000 | $ | 15.26 | $ | 45,780.00 |
| | | 9/30/2002 | 2,500 | $ | 15.08 | $ | 37,700.00 |
| 13 | | 9/30/2002 | 4,424 | $ | 14.94 | $ | 66,094.56 |
| | | | **64,565** | | | $ | **1,331,521.76** |
| 14 | | | | | | | |
| 15 | David Robbins | 8/28/2003 | 10,000 | $ | 22.02 | $ | 220,230.00 |
| | | 8/28/2003 | 40,000 | $ | 22.01 | $ | 880,440.00 |
| 16 | | 10/22/2002 | 20,000 | $ | 17.44 | $ | 348,800.00 |
| | | 10/22/2002 | 60,000 | $ | 17.62 | $ | 1,057,200.00 |
| 17 | | 10/23/2002 | 50,000 | $ | 17.78 | $ | 889,000.00 |
| 18 | | 10/17/2002 | 70,000 | $ | 16.23 | $ | 1,136,100.00 |
| | | | **250,000** | | | $ | **4,531,770.00** |
| 19 | | | | | | | |
| 20 | Anthony DiCesare | 8/8/2003 | 30,500 | $ | 20.68 | $ | 630,740.00 |
| | | 8/7/2003 | 369,836 | $ | 20.57 | $ | 7,607,526.52 |
| 21 | | 12/12/2002 | 25,000 | $ | 18.00 | $ | 450,000.00 |
| | | 12/11/2002 | 1,800 | $ | 18.03 | $ | 32,454.00 |
| 22 | | 10/22/2002 | 118,518 | $ | 17.69 | $ | 2,096,583.42 |
| | | 10/22/2002 | 177,338 | $ | 17.69 | $ | 3,137,109.22 |
| 23 | | 10/22/2002 | 6,754 | $ | 17.69 | $ | 119,478.26 |
| | | | **729,746** | | | $ | **14,073,891.42** |
| 24 | | | | | | | |
| 25 | Joel Kirschbaum | 8/7/2003 | **500,000** | $ | 20.35 | $ | **10,175,000.00** |
| 26 | Jacques André | 8/20/2003 | 14,288 | $ | 21.28 | $ | 304,048.64 |
| | | 10/24/2002 | 20,000 | $ | 17.77 | $ | 355,400.00 |
| 27 | | | **34,288** | | | $ | **659,448.64** |
| 28 | | **TOTAL** | **2,295,997** | | | $ | **44,417,889.38** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

120.   Plaintiff brings this action derivatively in the right and for the benefit of Alliance Gaming to redress injuries suffered, and to be suffered, by Alliance Gaming as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Alliance Gaming is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.   Plaintiff will adequately and fairly represent the interests of Alliance Gaming in enforcing and prosecuting its rights.

122.   Plaintiff is and was an owner of the stock of Alliance Gaming during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

123.   At the time this complaint was filed, the Board consisted of the following individuals: defendants André, Robbins, DiCesare, Kirschbaum, Verner, Haddrill and Race. Plaintiff did not make any demand on the Board to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

(a)   As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non public information regarding the improper accounting. While in possession of this material adverse non public information regarding the Company, the following current members of the Alliance Gaming Board participated in the illegal insider selling:

(i)   During the Relevant Period, Robbins sold 250,000 shares of Alliance Gaming stock for proceeds of $4,531,770.

(ii)   During the Relevant Period, DiCesare sold 729,746 shares of Alliance Gaming stock for proceeds of $14,073,891.42.

(iii)   During the Relevant Period, Kirschbaum sold 500,000 shares of Alliance Gaming stock for proceeds of $10,175,000.

1    (iv)    During the Relevant Period, André sold 34,288 shares of Alliance
2  Gaming stock for proceeds of $659,448.64.

3    (v)    Because these defendants received a personal financial benefit from
4  the challenged insider trading transactions, these defendants were interested.   Also, these
5  defendants face a substantial threat of liability for breach of their fiduciary duties for insider
6  selling.  Since these directors have breached their fiduciary duties and are interested, any demand
7  upon them is futile;

8    (b)    Defendants Robbins, Verner, Haddrill, Race and André were all members of
9  the Audit Committee during the Relevant Period.  Pursuant to the Charter, the duties of the Audit
10  Committee include representing and assisting the Board in discharging its oversight responsibility
11  relating to: (i) accounting, reporting, and financial practices of the Company including the integrity
12  of its financial statements; (ii) the surveillance of administration and financial controls and the
13  Company's compliance with legal and regulatory requirements; (iii) preparation of the report
14  required by the rules of the SEC to be included in the Company's annual proxy statement; (iv)
15  recommending to the Board whether the financial statements should be included in the annual
16  report on Form 10-K; (v) reviewing and discussing earnings press releases, and corporate practices
17  with respect to earnings press releases and financial information and earnings guidance provided to
18  analysts and rating agencies.  The Audit Committee is also responsible for: (i) reviewing and
19  engaging or re-engaging an independent accounting firm to audit the Company's financial
20  statements for the then-current fiscal year; (ii) reviewing and determining the policies and
21  procedures of the Company and management in maintaining the Company's books and records and
22  furnishing information necessary to the independent auditors; (iii) reviewing and determining the
23  adequacy and implementation of the Company's internal controls, including the internal audit
24  function and the adequacy and competency of the related personnel; and (iv) reviewing and
25  determining such other matters relating to the Company's financial affairs and accounts as the
26  Audit Committee may in its discretion deem desirable.  The Audit Committee met five times
27  during FY:03, seven times during FY:04 and eleven times in FY:05.  Nonetheless, the Audit
28  Committee recommended that the Board include the improper financial statements in Alliance

1    Gaming's Press Releases and documents as filed with the SEC. By such actions, defendants
2    Robbins, Verner, Haddrill, Race and André breached their duties by causing or allowing the
3    improper financials described above. As a result of these defendants' breach of their duties, any
4    demand upon them is futile;

5              (c)      As a result of their access to and review of internal corporate documents;
6    conversations and connections with other corporate officers, employees and directors; and
7    attendance at management and the Board meetings during FY:04 and/or FY:05, each of the
8    defendants knew the adverse non-public information regarding the improper accounting;

9              (d)      The Compensation Committee of the Board (i) annually reviews and
10    approves corporate goals and objectives relevant to CEO compensation, (ii) evaluates the CEO's
11    performance in light of those goals and objectives, (iii) recommends the CEO's compensation
12    levels to the Board based on this evaluation, and (iv) annually reviews and makes
13    recommendations to the Board with respect to the compensation of all directors, officer and other
14    key executives, including incentive-compensation plans and equity-based plans. The
15    Compensation Committee is comprised of defendants André, Robbins and Verner. As the
16    members of the Compensation Committee singularly control the other defendants' awards, the
17    remaining members of the Board will not institute this action against defendants André, Robbins
18    and Verner. To do so would jeopardize each defendant's personal financial compensation. Thus,
19    demand on defendants DiCesare, Haddrill, Kirschbaum and Race is futile;

20             (e)      Pursuant to his June 30, 2004 employment agreement, defendant Haddrill
21    became CEO on October 1, 2004 and stopped receiving compensation as a director. As CEO,
22    Haddrill receives $980,000 in salary (whereas the departing CEO, Miodunski's salary was
23    $478,846). Haddrill also received a non-statutory stock option grant to purchase 500,000 shares of
24    Company stock and a grant of restricted stock worth $6.5 million worth of common stock.
25    Accordingly, Haddrill lacks independence from defendants Robbins, Verner and André, the
26    Compensation Committee members, who are not disinterested and/or independent and who exert
27    influence over defendant Haddrill's compensation and continuing and future employment
28    agreements by virtue of their positions on the Board and Compensation Committee. Further,

1   pursuant to the Committee's Charter, they are responsible for reviewing and approving corporate
2   goals and objectives relevant to compensation, evaluate the CEO's performance in light of those
3   goals and objectives and determine and approve the CEO's compensation level based on this
4   evaluation. Also, as reported by the Company, for FY:04, "the entire Board of Directors generally
5   participated in deliberations concerning compensation of the Company's executive officers." Thus,
6   Hadrill lacks independence from the entire Board. This lack of independence renders defendant
7   Haddrill incapable of impartially considering a demand to commence and vigorously prosecute this
8   action as he would not want to jeopardize his principal professional employment;

9        (f)     Defendant Robbins, as Chairman of the Board, receives $235,000, which is
10  determined by the Compensation Committee.  Robbins lacks independence from defendants
11  Verner and André who are not disinterested and/or independent and who exert influence over
12  defendant Robbins' compensation by virtue of their positions on the Board and Compensation
13  Committee. Further, pursuant to the Committee's Charter, they are responsible for evaluating the
14  performance and compensation of the Chairman of the Board, as well as recommending to the
15  Board the Chairman's compensation.  This lack of independence renders defendant Robbins
16  incapable of impartially considering a demand to commence and vigorously prosecute this action;

17       (g)     Defendants Robbins and Kirschbaum also serve as members of the Office of
18  the Chairman, purportedly created "to oversee a seamless transition and management succession."
19  Pursuant to their employment agreements, Robbins and Kirschbaum receive salaries of $90,000
20  and $100,000, respectively for their service as members of the Office of the Chairman.
21  Additionally they each received a total of 234,000 stock purchase options from the Company in
22  FY:04.   Kirschbaum received another 35,000 options in FY:05.   Defendants Robbins and
23  Kirschbaum lack independence from defendants Verner and André who are not disinterested
24  and/or independent and who exert influence over defendant Robbins and Kirschbaum's
25  compensation by virtue of their positions on the Board and Compensation Committee. This lack of
26  independence renders defendants Robbins and Kirschbaum incapable of impartially considering a
27  demand to commence and vigorously prosecute this action.

28

1    (h)  The directors of the Board receive the following compensation: (i) the

2 Chairman of the Board receives $235,000 per year; and (ii) all other non-employee directors

3 receive $50,000 per year.  Defendants Robbins, Haddrill and Kirschbaum, as members of the

4 Office of the Chairman, receive a salary of $100,000 and a grant of 39,000 stock options, which

5 vest in equal increments on the first, second and third anniversary dates of the employment

6 agreements, at an exercise price of $17.16 and an exercise period of ten years.  In addition, each

7 non-employee director, who is not a member of the Office of the Chairman, receives $5,000 per

8 year for each committee they serve on, and the chairman of each committee receives an additional

9 $5,000 per year.  In addition, with the exception of the CEO who is a director, each new director

10 receives an option grant of 50,000 shares upon appointment to the Board and each director receives

11 an option grant of 30,000 shares on the date of each Annual Meeting.  All of these options are

12 granted with an exercise price equal to fair market value on the grant date, vest immediately, and

13 have ten year terms.  Additionally, all options granted to directors remain outstanding for the full

14 ten year term, whether or not the director continues to be a director of the Company (unless the

15 director resigns or is removed as a director before the expiration of the director's term, in which

16 event the options expire 60 days after resignation or removal).  Directors are also reimbursed for

17 their reasonable out of pocket expenses incurred on Company business.  The Company may grant

18 directors (both employee and non employee) additional cash compensation and options as time

19 commitments, responsibilities and other circumstances may warrant.  This compensation creates

20 debilitating conflicts for the directors.  Defendants Race, Robbins, DiCesare, Kirschbaum, Verner

21 and André will not jeopardize this lucrative compensation by taking the action plaintiff requests;

22    (i)  Since June of 2004, a number of actions have been filed against Alliance

23 Gaming related to the incidents described herein.  On September 13, 2004, the Individual

24 Defendants caused or allowed Alliance Gaming to file its Form 10-K for FY:04, signed by

25 defendants Miodunski, Saxton, André, DiCesare, Kirschbaum, Robbins, Verner and Hadrill.  The

26 Form 10-K provides in part:

27    In June 2004, putative class actions were filed against Alliance Gaming
    Corporation and its officers, Robert Miodunski, Robert Saxton, Mark Lerner, and
28    Steven Des Champs, in the Federal District Court for the District of Nevada.  The

nearly identical complaints allege violations of the Securities Exchange Act of 1934 stemming from revised earnings guidance, declines in the stock price, and sales of stock by insiders.... *Alliance believes the lawsuits are without merit and intends to vigorously defend itself and its officers*. In addition, in July 2004 two derivative lawsuits were filed in Nevada state court against the members of the board of directors and the officers listed above.... These lawsuits assert claims for breach of fiduciary duty and waste of corporate assets *arising out of the same events as those giving rise to the class actions described above*.

(j)     As of December 30, 2005, in spite of the addition of a new board member (defendant Race), this view of the Director Defendants has not changed.  On that date, the Individual Defendants caused or allowed the Company to file its Form 10-K for FY:05, which repeated the language from the previous Form 10-K, and adding that:

These two cases were consolidated, and Alliance and the other defendants moved to dismiss the case. In February 2005, the state district court granted the defendants' motion and dismissed the case, and the plaintiffs have appealed the case the Nevada Supreme Court, where the matter is pending.  *Management believes the plaintiffs' lawsuit to be without merit.* The Company will continue to pursue all available legal defenses.

This form was signed by defendants Haddrill, Des Champs, André, DiCesare, Kirschbaum, Race, Robbins and Verner.

(k)     By these statements, it is clear that any demand in the present action would have been futile because the Director Defendants had already concluded that the allegations in other Class and Derivative actions, which arise out of similar facts as this action, are factually incorrect, legally insufficient or essentially without merit.  Further, in spite of revelations of improper accounting practices, a restatement of financial statements, a formal SEC investigation, and a continuing degradation of the Company's stock price, as well as its reputation and goodwill, the Individual Defendants have sought and continue to actively seek to ensure the actions brought against them on behalf of the Company are dismissed without investigation.  At the same time, the Individual Defendants refuse to take any action in line with their duties and obligations to the Company and its shareholders to rectify the problems they created which have lead to restatements of income and late filing of Forms 10-K and 10-Q.

Accordingly, the Individual Defendants have already received notice of this action's allegations, made their assessment as to the merits of those allegations, and through their actions, have made a clear declaration of their unwillingness to initiate litigation on behalf of the Company

1   in order to address the harm done to the Company by Director Defendants' conduct.   The
2   Individual Defendants have thereby demonstrated that those who would have had to prosecute this
3   action pursuant to any demand made by Plaintiff would clearly have refused to do so;

4              (l)    The entire Board and senior management participated in the wrongs
5   complained of herein. Alliance Gaming's directors are not disinterested or independent due to the
6   following: defendants Miodunski, Robbins, DiCesare, Kirschbaum, Verner, Haddrill, Race and
7   André served on the Company's Board during the Relevant Period.   Pursuant to their specific
8   duties as Board members, each was charged with the management of the Company and to conduct
9   its business affairs. Each of the above referenced defendants breached the fiduciary duties that
10  they owed to Alliance Gaming and its shareholders in that they failed to prevent and correct the
11  improper financials. Thus, the Board cannot exercise independent objective judgment in deciding
12  whether to bring this action or whether to vigorously prosecute this action because its members are
13  interested personally in the outcome as it is their actions that have subjected Alliance Gaming to
14  millions of dollars in liability for possible violations of applicable securities laws;

15             (m)   The Individual Defendants, because of their inter related business,
16  professional and personal relationships, have developed debilitating conflicts of interest that
17  prevent the Board members of the Company from taking the necessary and proper action on behalf
18  of the Company as requested herein. In addition to the conflicts that exist as a result of their
19  participation in the improper accounting and insider selling, as detailed herein supra, the majority
20  of the Board, including the defendants listed below, are subject to the following prejudicial
21  entanglements:

22             (i)    Defendant DiCesare was employed by Kirkland Investment
23  Corporation ("KIC") which was the sole general partner of Kirkland Ft. Worth Investment
24  Partners, LP ("KFW") from April 1991 to July 1994 and he served as Executive Vice President
25  Development from July 1994 through June 1997. Defendant Kirschbaum is the sole stockholder,
26  director and officer of KIC and has been with KIC and KFW since January 1991. DiCesare and
27  Kirschbaum both joined the Board of Alliance Gaming in July 2004. Because of this longstanding
28  business relationship any demand on defendants DiCesare and Kirschbaum would have been futile.

1          (ii)     On July 1, 2004, the Individual Defendants caused or allowed the
2   Company to enter into an agreement with KIC whereby KIC provides consulting services to the
3   Company at a current rate of $600,000 annually for a period of 3.5 years ("Consulting
4   Agreement"). Consequently, defendant Kirschbaum, as the sole stockholder, officer, and director
5   of KIC, lacks independence from defendants André, DiCesare, Haddrill, Race, Robbins and Verner
6   who are not disinterested and/or independent and who exert influence over defendant Kirschbaum
7   by virtue of their positions on the Board and their continued review of the Consulting Agreement
8   with KIC. This lack of independence renders defendant Kirschbaum incapable of impartially
9   considering a demand to commence and vigorously prosecute this action.

10          (n)     The Director Defendants of Alliance Gaming, as more fully detailed herein,
11   participated in, approved and/or permitted the wrongs alleged herein to have occurred and
12   participated in efforts to conceal or disguise those wrongs from Alliance Gaming's stockholders or
13   recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not
14   disinterested parties;

15          (o)     In order to bring this suit, all of the directors of Alliance Gaming would be
16   forced to sue themselves and persons with whom they have extensive business and personal
17   entanglements, which they will not do, thereby excusing demand;

18          (p)     The acts complained of constitute violations of the fiduciary duties owed by
19   Alliance Gaming's officers and directors and these acts are incapable of ratification;

20          (q)     Each of the Director Defendants of Alliance Gaming authorized and/or
21   permitted the false statements disseminated directly to the public or made directly to securities
22   analysts and which were made available and distributed to shareholders, authorized and/or
23   permitted the issuance of various of the false and misleading statements and are principal
24   beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a
25   suit even if such suit was instituted by them;

26          (r)     Any suit by the current directors of Alliance Gaming to remedy these
27   wrongs would likely expose the Individual Defendants and Alliance Gaming to further violations
28   of the securities laws that would result in civil actions being filed against one or more of the

1  Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent

2  determination whether to sue themselves;

3           (s)     Alliance Gaming has been and will continue to be exposed to significant

4  losses due to the wrongdoing complained of herein, yet the Individual Defendants and current

5  Board have not filed any lawsuits against themselves or others who were responsible for that

6  wrongful conduct to attempt to recover for Alliance Gaming any part of the damages Alliance

7  Gaming suffered and will suffer thereby;

8           (t)     If the current directors were to bring this derivative action against

9  themselves, they would thereby expose their own misconduct, which underlies allegations against

10  them contained in class action complaints for violations of securities law, which admissions would

11  impair their defense of the class actions and greatly increase the probability of their personal

12  liability in the class actions, in an amount likely to be in excess of any insurance coverage

13  available to the Individual Defendants. In essence, they would be forced to take positions contrary

14  to the defenses they will likely assert in the securities class actions. This they will not do. Thus,

15  demand is futile; and

16           (u)     If Alliance Gaming's current and past officers and directors are protected

17  against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary

18  duty alleged in this Complaint by directors' and officers' liability insurance, they caused or allowed

19  the Company to purchase that insurance for their protection with corporate funds, i.e., monies

20  belonging to the stockholders of Alliance Gaming. However, due to certain changes in the

21  language of directors' and officers' liability insurance policies in the past few years, the directors'

22  and officers' liability insurance policies covering the defendants in this case contain provisions that

23  eliminate coverage for any action brought directly by Alliance Gaming against these defendants,

24  known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to

25  sue themselves or certain of the officers of Alliance Gaming, there would be no directors' and

26  officers' insurance protection and thus, this is a further reason why they will not bring such a suit.

27  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

28  coverage exists and will provide a basis for the Company to effectuate recovery. If there is no

1   directors' and officers' liability insurance at all then the current directors will not cause Alliance

2   Gaming to sue them, since they will face a large uninsured liability.

3      124.   Moreover, despite the Individual Defendants having knowledge of the claims and

4   causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for

5   Alliance Gaming for any of the wrongdoing alleged by plaintiff herein.

6      125.   Plaintiff has not made any demand on shareholders of Alliance Gaming to institute

7   this action since such demand would be a futile and useless act for the following reasons:

8         (a)   Alliance Gaming is a publicly held company with over 51 million shares

9   outstanding, and thousands of shareholders;

10        (b)   Making demand on such a number of shareholders would be impossible for

11  plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders;

12  and

13        (c)   Making demand on all shareholders would force plaintiff to incur huge

14  expenses, assuming all shareholders could be individually identified.

15                          **FIRST CAUSE OF ACTION**

16      **Against the Insider Selling Defendants for Breach of Fiduciary Duties for
17          Insider Selling and Misappropriation of Information**

18      126.   Plaintiff incorporates by reference and realleges each and every allegation set forth

    above, as though fully set forth herein.
19
        127.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew
20
    the information described above, and sold Alliance Gaming common stock on the basis of such
21
    information.
22
        128.   The information described above was proprietary non-public information
23
    concerning the Company's financial condition and future business prospects. It was a proprietary
24
    asset belonging to the Company, which the Insider Selling Defendants used for their own benefit
25
    when they sold Alliance Gaming common stock.
26
        129.   At the time of their stock sales, the Insider Selling Defendants knew that the
27
    Company's revenues were materially overstated. The Insider Selling Defendants' sales of Alliance
28

1 | Gaming common stock while in possession and control of this material adverse non-public
2 | information was a breach of their fiduciary duties of loyalty and good faith.

3 |     130.    Since the use of the Company's proprietary information for their own gain
4 | constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to
5 | the imposition of a constructive trust on any profits the Insider Selling Defendants obtained
6 | thereby.

7 | **SECOND CAUSE OF ACTION**
8 | **Against All Defendants for Breach of Fiduciary Duty**

9 |     131.    Plaintiff incorporates by reference and realleges each and every allegation contained
10 | above, as though fully set forth herein.

11 |     132.    The Individual Defendants owed and owe Alliance Gaming fiduciary obligations.
12 | By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed
13 | and owe Alliance Gaming the highest obligation of good faith, fair dealing, loyalty and due care.

14 |     133.    The Individual Defendants, and each of them, violated and breached their fiduciary
15 | duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

16 |     134.    Each of the Individual Defendants had actual or constructive knowledge that they
17 | had caused or allowed the Company to improperly misrepresent the financial results of the
18 | Company and failed to correct the Company's publicly reported financial results and guidance.
19 | These actions could not have been a good faith exercise of prudent business judgment to protect
20 | and promote the Company's corporate interests.

21 |     135.    As a direct and proximate result of the Individual Defendants' failure to perform
22 | their fiduciary obligations, Alliance Gaming has sustained significant damages. As a result of the
23 | misconduct alleged herein, the Individual Defendants are liable to the Company.

24 |     136.    Plaintiff on behalf of Alliance Gaming has no adequate remedy at law.

25 | **THIRD CAUSE OF ACTION**
26 | **Against All Defendants for Abuse of Control**

27 |     137.    Plaintiff incorporates by reference and realleges each and every allegation contained
28 | above, as though fully set forth herein.

138.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Alliance Gaming, for which they are legally responsible.

139.   As a direct and proximate result of the Individual Defendants' abuse of control, Alliance Gaming has sustained significant damages.

140.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.   Plaintiff on behalf of Alliance Gaming has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### Against All Defendants for Gross Mismanagement

142.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Alliance Gaming in a manner consistent with the operations of a publicly held corporation.

144.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Alliance Gaming has sustained significant damages in excess of hundreds of millions of dollars.

145.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

146.   Plaintiff on behalf of Alliance Gaming has no adequate remedy at law.

### FIFTH CAUSE OF ACTION

### Against All Defendants for Waste of Corporate Assets

147.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.   As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused or allowed Alliance Gaming to waste valuable corporate assets by paying

1  incentive based bonuses to certain of its executive officers and incur potentially millions/billions of

2  dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

3      149.  As a result of the waste of corporate assets, the Individual Defendants are liable to

4  the Company.

5      150.  Plaintiff on behalf of Alliance Gaming has no adequate remedy at law.

6  **SIXTH CAUSE OF ACTION**

7  **Against All Defendants for Unjust Enrichment**

8      151.  Plaintiff incorporates by reference and realleges each and every allegation set forth

9  above, as though fully set forth herein.

10      152.  By their wrongful acts and omissions, defendants were unjustly enriched at the

11  expense of and to the detriment of Alliance Gaming.

12      153.  Plaintiff, as a shareholder and representative of Alliance Gaming, seeks restitution

13  from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

14  benefits and other compensation obtained by these defendants, and each of them, from their

15  wrongful conduct and fiduciary breaches.

16  **SEVENTH CAUSE OF ACTION**

17  **Against Defendants Miodunski, Haddrill and Saxton for Disgorgement**

18  **Under the Sarbanes-Oxley Act of 2002**

19      1.  Plaintiff incorporates by reference and realleges each and every allegation set forth

20  above, as though fully set forth herein.

21      2.  Pursuant to the Sarbanes-Oxley Act of 2002 §304, because Alliance Gaming will

22  restate its financial statements for fiscal years 2003, 2004 and 2005 due to material

23  noncompliance with SEC rules and published guidance as a result of false and misleading

24  financial statements, defendant Miodunski, as Alliance Gaming's CEO during FY:03 and FY:04,

25  defendant Haddrill, as Alliance Gaming's CEO during FY:04 and FY:05, and defendant Saxton,

26  as Alliance Gaming's CFO during FY:05 and FY:05, are required to reimburse Alliance Gaming

27  for all bonuses or other incentive-based or equity based compensation, received by them from

28  Alliance Gaming during the fiscal years 2003, 2004 and 2005.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Declaring that defendants Miodunski, Haddrill and Saxton are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse Alliance Gaming for all bonuses or other incentive-based or equity-based compensation received by them during fiscal years 2003, 2004 and 2005.

C.      Directing the Individual Defendants to take all necessary actions to reform and improve Alliance Gaming's corporate governance and internal procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before the shareholders for a vote following Corporate Governance Policies:

1.      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Alliance Gaming to nominate at least three candidates for election to the Board;

3.      appropriately test and then strengthen the internal audit and control functions; and

4.      control and limit insider stock selling;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Alliance Gaming has an effective remedy;

1       E.    Awarding to Alliance Gaming restitution from the defendants, and each of them,

2   and ordering disgorgement of all profits, benefits and other compensation obtained by the

3   defendants;

4       F.    Awarding to plaintiff the costs and disbursements of the action, including

5   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

6       G.    Granting such other and further relief as the Court deems just and proper.

7   **JURY DEMAND**

8   Plaintiff demands a trial by jury.

9   DATED:   March 27, 2006

ALBRIGHT, STODDARD, WARNICK &
PALMER, P.C.
G. MARK ALBRIGHT
WILLIAM B. PALMER, II


_____
G. MARK ALBRIGHT, ESQUIRE
Nevada Bar No. 001394
801 South Rancho Drive
Quail Park - Suite D-4
Las Vegas, NV 89106
Telephone: 702/394-7111
Facsimile: 702/384-0605

*Liaison Counsel for Plaintiffs*

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
KELLY M. MCINTYRE
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

FARUQI & FARUQI, LLP
SHANE ROWLEY
DAVID H. LEVENTHAL
320 East 39th Street
New York, NY 10016
Telephone: 212/983-9330
Facsimile: 212/983-9331

*Co-Lead Counsel for Plaintiff*

## VERIFICATION

I, GERALDINE H. LONGBINE, have read the Alliance Gaming Corporation Verified Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3/6/06

GERALDINE H. LONGBINE